In re Gregory T. **PULOS** and Patricia A. Pulos, Debtors.

Thomas F. **MILLER**, as Trustee of the Estate of Gregory T. Pulos and Patricia A. Pulos; and Norwest Bank Minnesota, National Association, Plaintiffs,

v.

Gregory T. **PULOS** and Patricia A. Pulos, Defendants.

**NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,**
Plaintiff,

v.

Gregory T. **PULOS** and Patricia A. Pulos, Defendants.

Timothy D. **MORATZKA**, Trustee for the Bankruptcy Estate of Computer Designed Systems, Inc. and CDS Financial Corp., Plaintiff,

v.

Gregory T. **PULOS** and Patricia A. Pulos, Defendants.

Bankruptcy No. 4–93–4493.
Adv. Nos. 4–93–441, 4–93–442 and 4–93–486.

United States Bankruptcy Court, D. Minnesota.

June 21, 1994.

Garrett M. Vail, Christoffel & Elliott, P.A., St. Paul, MN, for debtors.

Thomas F. Miller, Trustee, Minneapolis, MN.

Timothy D. Moratzka, Mackall, Crounse & Moore, Minneapolis, MN, trustee for defendant Computer Designed Systems, Inc. and CDS Financial Corp.

Bradley Halberstadt, Mackall, Crounse & Moore, Minneapolis, MN, for trustee of Computer Designed Systems, Inc. and CDS Financial Corp.

Dennis Ryan, Faegre & Benson, Minneapolis, MN, for Norwest Bank.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 19th day of May, 1994, on a motion by Thomas

Miller ("trustee"), Timothy Moratzka ("Moratzka") and Norwest Bank Minnesota, National Association ("Norwest Bank") (collectively "the Movants") for summary judgment. Appearances were as follows: Thomas Miller as and for the trustee; Bradley Halberstadt for Moratzka; Dennis Ryan for Norwest Bank; and Garret Vail for the defendants Gregory Pulos ("Gregory") and Patricia Pulos ("Patricia") (collectively the "Debtors").

The Court, having considered the pleadings in the action, memoranda of law, all affidavits, and the arguments of counsel, concludes that the motion for summary judgment should be granted, and makes the following:

## FINDINGS OF FACT

1. Debtors, who have been married for 25 years, filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on July 30, 1993 ("petition date").

2. Gregory was formerly President and CEO of a publicly held company, Computer Designed Systems, Inc. ("CDS"), that was engaged in the manufacture and sale of computer hardware to end users. Gregory started CDS in 1974. CDS was incorporated in 1977. Gregory was also President and CEO of a related financing company, CDS Financial Corp. ("Financial"), which was engaged primarily in financing leases between CDS and end users. Debtors were the sole shareholders and officers of both CDS and Financial.

3. On February 15, 1991, CDS and Financial filed a voluntary petition for relief under chapter 11 of the Code. On April 17, 1991, the cases were converted to chapter 7. Moratzka was then appointed the chapter 7 trustee of the combined estates of CDS and Financial. In April, 1991, Moratzka evicted Debtors from the premises of CDS. They have not had access to the building since.

4. In April, 1993, in connection with the CDS and Financial bankruptcies, Moratzka filed a complaint against the Debtors seeking in excess of $1.5 million, which Moratzka alleges was fraudulently diverted from CDS and Financial. Approximately three months later, Debtors filed their petition for relief.

5. On the petition date, Gregory was Vice President of Migrations Solutions, Inc. Patricia was Vice President of Information Systems at Harmon Glass. In their Third Amended Statement of Financial Affairs ("Statement") that accompanied their schedules, Debtors indicated that Gregory's salary for 1993 was $56,675, and that Patricia's salary for 1993 was $62,104. According to the Statement, Debtors' combined yearly income for 1992 was $224,250, and their combined yearly income for 1991 was $248,791.

6. On September 15, 1993, Debtors attended the § 341 Meeting of Creditors ("§ 341 meeting"). At the § 341 meeting, Debtors discussed their pre-bankruptcy planning and transfers of real and personal property. They also discussed their numerous bank and brokerage accounts.

7. On November 1, 1993, the trustee filed a complaint initiating this adversary proceeding seeking the denial of the Debtors' discharge. On the same day, Norwest also filed a complaint claiming that Debtors were liable to Norwest for approximately $2 million on a personal guaranty they executed on behalf of a loan to CDS, and seeking a denial of the Debtors' discharge. On December 20, 1993, Moratzka filed a complaint alleging that Debtors diverted from CD in excess of $1.5 million, and seeking a denial of the discharge. By Order dated February 1, 1994, these adversary proceedings were consolidated.

8. In response to the trustee's request for Debtors' financial records, Debtors produced two file boxes of documents. On April 22, 1994, the trustee went to Debtors' former counsel's office to review the documents. The trustee subsequently photocopied all the produced documents, which consisted of the following:

 a. The Debtors' federal and Minnesota tax returns from 1991 with all the schedules;

 b. The Debtors' federal and Minnesota tax returns from 1992 with all the schedules and attached copies of: (1) receipts for claimed deductible expenses; (2) 1098 and 1099 tax forms; (3) cancelled checks for deductible donations; (4) cancelled checks for ac-

countants' fees; (5) cancelled checks for attorneys' fees; (6) cancelled checks relating to Lindawood Apartments expenses; (7) and a few cancelled checks pertaining to other properties owned by Debtors;

c. Various statements and information from 1986 through 1992 regarding Northwoods Apartments, an apartment complex owned by a partnership in which Debtors were once partners;

d. A one-page confirmation statement from a brokerage account reflecting a post-petition securities transaction;

e. American Express and Visa Account Summaries for 1992;

f. Patricia's check registers for checks written post-petition between August 16, 1993 and March 27, 1994.

9. Soon thereafter, the Movants brought this motion for summary judgment. The Movants argue that Debtors should be denied a discharge for failure to adequately keep records pursuant to § 727(a)(3) of the Code.

10. On May 19, 1994, I held a hearing on the motion for summary judgment. At the hearing, the trustee submitted into evidence copies of all the documents the Debtors had produced to the trustee in April, 1994 ("Exhibit C").[1] Debtors did not submit into evidence any financial records or documents.[2]

11. After the hearing, Debtors submitted to this Court an affidavit of Gregory Pulos stating that it was Debtors' regular practice to retain their monthly bank statements and cancelled checks for preparation of their income tax returns. At the end of each year, they delivered these records, along with other tax-related documents, to their accountant. After the tax return was filed, Debtors would keep a copy of the tax return and all documentation necessary to substantiate the return. Gregory stated that all "nonessential records, including non-tax or non-investment related cancelled checks" were discarded. Attached to the affidavit were copies of monthly statements and cancelled checks from their personal checking account from January 1, 1993 through January 1, 1994.[3]

12. Based upon all the evidence, including the Statement, Debtors' § 341 meeting testimony, Exhibit C and Gregory Pulos' affidavit with the 1993 documents, it is undisputed that Debtors had numerous bank and brokerage accounts, engaged in the sale of real property, and made extensive house payments prior to the petition date. The following is a list of the Debtors' activities between May, 1991 and the petition date.[4] When applicable, reference is made to the records and documents Debtors have produced that relate to the transaction or activity described.

### a. *Accounts*

1. *Hayne Miller & Farni brokerage account.* According to the Statement, Debtors sold $51,392 worth of stock through this account. The Statement does not indicate

---

1. The trustee also submitted the following: (1) an affidavit of the trustee with attached copies of the Debtors' petition and Statement, the transcript from the § 341 meeting, and various receipts; (2) an affidavit of Moratzka; and (3) an affidavit of Dennis Ryan, counsel for Norwest, with an attached copy of an deposition transcript of Gregory Pulos taken in connection with a state court proceeding against CDS.

2. Debtors did submit the following: (1) an affidavit of Arlo Vande Vegte, Debtors' counsel in another proceeding, with various attachments; and (2) an affidavit of Gregory Pulos.

3. At the hearing, Debtors insisted that they could not produce any financial documents from January 1, 1993 through December 31, 1993 as their accountant was preparing their 1993 tax returns and had possession of the relevant documents.

As a result, I noted at the hearing that there was a factual dispute for the year 1993. Debtors have since submitted these documents for consideration on the motion. The Movants objected to the submission as untimely. In ruling on the motion for summary judgment, I am considering the affidavit of Gregory Pulos and the attached records to be part of the record.

4. In an affidavit, Gregory explains the absence of documents prior to 1991. He states that Debtors kept all their personal records at CDS and that they have not been able to retrieve these documents after being evicted from CDS in April, 1991. At the hearing I ruled that a material issue of fact exists concerning adequate documentation prior to April, 1991. Accordingly, this decision is based solely on the records Debtors have produced from May, 1991 through December, 1993.

when the transfers occurred. Debtors have produced no records relating to pre-petition activities in this account. They have only produced a confirmation order reflecting a post-petition securities transaction dated September 15, 1993.

2. *Citizens State Bank checking account* ("Citizens account"). Debtors' used this personal checking account frequently. Debtors have produced no records relating to the pre-petition activity in this account between May, 1991 and December, 1992. They have now produced copies of the monthly statements, cancelled checks and deposit tickets for all of 1993.

3. *NCR Credit Union savings account.* This account was still open as of the petition date. Debtors have not produced any statements or related documents in connection with this account.

4. *Canadian Imperial Bank of Commerce checking account.* Debtors testified at the § 341 meeting that they opened a Canadian checking account in the late 1970's or 1980's for the convenience of buying groceries and other amenities when in Canada. According to Debtors, they last deposited money into the account in September, 1993. Debtors have produced no records regarding activity in this account, except for two "statements of interest credited" that were attached to the Debtors' 1991 and 1992 tax returns.

5. *Closed accounts.* Debtors closed four accounts in July, 1993—the same month Debtors filed their petition. These accounts included: (1) a Citizens State Bank savings account and CD; (2) a First Bank savings account; (3) a VIP Metro Credit Union savings and checking account; and (4) a Piper, Jaffrey & Hopwood account in Duluth. Debtors have produced no records pertaining to these four accounts, except for the 1099 tax forms for the latter two accounts attached to their 1991 tax returns.

**b. Credit Cards**

1. *American Express Gold Card.* Debtors testified at the § 341 meeting that they

frequently used the American Express card, which is in both their names, for business expenses. Debtors have produced no records on this account except for a copy of the Year–End Summary of Activity that was attached to Debtors' 1992 tax return and cancelled checks payable to American Express in 1993 from the Citizens account.

2. *Visa Gold Card.* The Visa card was in Gregory's name only. Debtors have produced no records on this account except for a Year–End Statement and Summary of Activity that was attached to their 1992 tax return and copies of cancelled checks payable to Visa in 1993 from the Citizens account.

**c. Transfers of Real Property**

1. *Northwoods Apartments.* This apartment complex was owned by Patricia Pulos & Associates ("PP & A"). Debtors were general partners of PP & A, and they received a partnership distribution of $35,678 in 1992, and $43,824 in 1991. The partnership sold the complex in 1992 for $939,000, of which Debtors claim they netted $272,524.30.

Debtors have produced no records pertaining to the purchase, ownership, or sale of their partnership interest in PP & A or the property itself. They have, however, produced a vast amount of insignificant documents generally pertaining to Northwoods.[5] These records include, among other things, copies of: (1) monthly Minnesota Housing Finance Agency status reports dating from 1986; (2) a record of the mortgage loan payments from 1985; (3) a tenant handbook; (4) check registers; (5) checks paid to PP & A from Northwoods in 1988; (6) handwritten notes from the property managers to the Debtors from 1988; (7) attorney correspondence; and (8) numerous receipts, including one from a plumber from 1988.

2. *"Lindawood".* Debtors received $36,800 of rental income from this property during 1991 and 1992. In early 1993, Debtors sold the property for $225,000. To finance the sale, Debtors paid the first and second mortgage and then took a contract for deed in the balance—about $110,000. On July 30,

---

5. At least four-fifths (⅘) of the documents comprising Exhibit C relate to Northwoods. Exhibit C contains 2864 pages of copied documents. Of these pages, 2351 refer to Northwoods.

1993, Debtors sold their interest in the contract for deed for $103,000 cash.

Debtors have produced no records relating to the purchase, ownership or sale of this property. Nor have they produced complete rental income information, or a copy of the contract for deed. The only records relating to Lindawood were those attached to the 1992 tax return, which include copies of: (1) three personal checks, one with a notation indicating it was a return of a security deposit; (2) a handwritten, one page ledger of rents received in 1992; (3) an annual tax and mortgage interest statement from 1992; (4) a 1992 property tax statement; (5) utility bills; and (6) invoices and cancelled checks relating to house and pool repairs.

3. *Timber Hills property.* On July 29, 1993, Debtors transferred this property for $180,000, along with a barn for $16,800 and personal property for $9,275. This was a cash sale. Debtors testified at the § 341 meeting that they had an appraisal done on the barn to reach a fair price. Debtors have not submitted any records relating to the appraisal. Nor have they produced any documents relating to the purchase, ownership or sale of the property.

4. *Todd County property.* Debtors purchased this farm property in 1972, and sold it for $16,000 cash on July 28, 1993. Debtors have not produced any records regarding the purchase, ownership or sale of this property.

5. *House in Plymouth.* Debtors received $8,775 of rental income from this house in 1991. Debtors sold it for $130,000 cash. Debtors have produced no documents relating to the purchase, ownership or sale of this property, except for a copy of an invoice for the installation of a water conditioner that was attached to the 1992 tax return.

6. *Captiva Island, Florida Rental Time Share.* Debtors received $1,556 of rental income from this property during 1991 and 1992. Debtors sold their interest to a friend on July 28, 1993 for $24,000 cash. Debtors have produced no records relating to the purchase, ownership or sale of property interest, except for a personal check to the time share dated January 4, 1992, and an invoice from December, 1992. Both these records were attached to the Debtors' 1992 tax return.

### d. *Transfers of Personal Property*

1. *Jewelry.* Debtors testified that they received between $20,000 and $30,000 cash for the sale of jewelry from 1990 to the petition date. Debtors have produced no records pertaining to the sale of the jewelry.

2. *Furs.* Debtors sold three fur coats, one watch and a tread mill prior to the petition date for $850 cash. Debtors also sold their 1993 Viking Tickets to the same person for approximately $1,300 cash in June, 1993. Debtors have produced no records regarding the sale of these items.

3. *Snowmobiles.* On July 28, 1993, Debtors sold, among other things, two snowmobiles and a snowmobile trailer for $8,350 cash. Debtors have produced no records regarding the sale of these items.

4. *Other transfers.* On July 28, 1993, Debtors transferred for $50,000 cash: (1) an assignment of a claim to $30,000 on deposit in state court; (2) an assignment to the proceeds of the sale of Lindawood; and (3) an interest in a Cessna plane. Debtors have produced no records relating to their ownership or sale of these interests.

### e. *Homestead Mortgage.*

Debtors' homestead is located at 410 Lake Terrace, Maple Plain, MN. When Debtors purchased the property, they took out a mortgage for approximately $850,000. Their schedules list the homestead with a current value of $1.2 million subject to a secured claim of $80,000. The proceeds from the majority of the sales listed above were, for the most part, applied to Debtor's mortgage on their homestead.[6] The payments were as follows:

---

6. On July 30, 1993, the Minnesota homestead exemption provided for an unlimited exemption. The statute was amended to provide for a $200,- 000 exemption in the value of the homestead. The amendment was effective August 1, 1993— the day before the petition date.

| | |
|---|---|
| 5/8/93 | $3,789.50 |
| 6/6/93 | $3,789.50 |
| 7/6/93 | $3,789.50 |
| 7/21/93 | $51,215.28 |
| 7/28/93 | $202,193.00 |
| 7/28/93 | $8,350.00 |
| 7/29/93 | $11,127.29 |
| 7/29/93 | $50,000.00 |
| 7/30/93 | $124,000 |

Debtors have provided the cancelled checks from 1993 reflecting these payments. Debtors have produced no other records pertaining to the mortgage or the property.

**f. Federal and State Tax Returns**

Debtors have produced their 1991 and 1992 federal and state income tax returns. Attached to the 1992 return was documentation for various deductions and expenses. A summary of the attachment is as follows: (1) 1992 property tax statements for various properties; (2) checks and receipts of charitable donations; (3) various receipts, including a receipt from Waconia Farm Supply in the amount of $5.64 for solar salt; (4) copies of checks paid to attorneys and accountants; (5) receipts relating to Lindawood; (6) invoices for Debtors' two automobile leases; and (7) American Express and Visa card Year-End Summaries.

### CONCLUSIONS OF LAW

**A. Standards for Summary Judgment**

Summary judgment is governed by Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056. Federal Rule 56 provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party on summary judgment bears the initial burden of showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party is the plaintiff, it carries the additional burden of presenting evidence that establishes all elements of the claim. *United Mortgage Corp. v. Mathern (In re Mathern)*, 137 B.R. 311, 314 (Bankr. D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn. 1992). The burden then shifts to the non-moving party to produce evidence that would support a finding in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). This responsive evidence must be probative, and must "do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

In weighing the evidence, the court may address whether the respondent's theory on the facts is "implausible." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989). The court may also gauge the reasonableness of competing inferences asserted on the same basic evidence. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir.1985); *Mathern*, 137 B.R. at 322. The reasonableness of asserted inferences is measured against the viability of the legal theory which they are asserted to support, and is also controlled by the weight and probity of the evidence advanced to support them. *Mathern*, 137 B.R. at 322–23. The ultimate question is whether reasonable minds could differ as to the factual interpretation of the evidence of record. *Id.* at 323 (citing *Liberty Lobby*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12). Thus, in some instances, a court may rely on inferences to grant a motion for summary judgment, even where subjective intent is an issue. *Id.* at 322; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989).

**B. Standards for Denial of Discharge under § 727(a)(3)**

Section 727(a)(3) of the Code provides that the court shall grant a debtor a discharge unless:

> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including

books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The purpose of this section is to give the trustee, creditors and the court complete and accurate information concerning the status of the debtor's affairs and financial history, and to test the completeness of the disclosure requirements to a discharge. *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992); *Bay View Laundry, Inc. v. Artura (In re Artura)*, 165 B.R. 12, 15 (Bankr.E.D.N.Y.1994); *United Mortgage Corp. v. Mathern (In re Mathern)*, 137 B.R. 311, 317 (Bankr.D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn.1992). Where the debtors are married, both have an obligation to keep adequate records. *Cox v. Landsdowne (In re Cox)*, 904 F.2d 1399, 1402 (9th Cir.1990). Intent is not an element to a § 727(a)(3) objection to discharge. *Olson v. Potter (In re Potter)*, 88 B.R. 843, 848 (Bankr.N.D.Ill.1988). The disclosure of the debtor's financial condition is a prerequisite to obtaining a discharge. *Meridian Bank*, 958 F.2d at 1230; *Peoples State Bank of Mazeppa, MN v. Drenckhahn (In re Drenckhahn)*, 77 B.R. 697, 707 (Bankr.D.Minn.1987).

The plaintiff seeking denial of the discharge has the burden of proving the inadequacy of the debtor's records. Once the plaintiff has shown that the debtor's records are inadequate, the burden then shifts to the debtor to prove that the failure to keep adequate records was justified under the circumstances. If the lack of records is not adequately explained, the debtor is not entitled to a discharge. *Community Bank of Homewood–Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 924 (Bankr.N.D.Ill.1992); *Mathern*, 137 B.R. at 317–18; *In re Esposito*, 44 B.R. 817, 826 (Bankr.S.D.N.Y.1984).

C. *Discussion*

1. *Adequacy of Debtors' Records*

The adequacy of a debtor's books and records turns on whether the debtor's present financial condition and the debtor's recent business transactions for a reasonable period in the past can be ascertained with substantial completeness and accuracy. *Artura*, 165 B.R. at 15; *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr.N.D.Ill.1992); *Leverage Leasing Corp. v. Reitz (In re Reitz)*, 69 B.R. 192, 197 (N.D.Ill.1986). The Code does not require an impeccable system of bookkeeping. Records, however, must "sufficiently identify the transaction so that intelligent inquiry can be made of them." *Meridian*, 958 F.2d at 1230 (quoting *Matter of Decker*, 595 F.2d 185, 187 (3d Cir.1979)).

Here, Debtors have failed to keep any recorded information from which their financial condition or business transactions may be ascertained. There are virtually no records relating to Debtors' finances or businesses dating from May, 1991 through December, 1992. There are no bank account statements, cancelled checks or check registers, with the exception of the copies of checks (generally evidencing deductible expenses) attached to Debtors' 1991 and 1992 tax returns. The documents missing are the sort of records the trustee and creditors need to reconstruct the Debtors' financial dealings. It would be impossible, however, to do so based on a few checks saved for purposes of income tax deductions.

Moreover, Debtors have produced no documentation whatsoever pertaining to the sale of the Northwoods Apartments in 1992. Debtors have turned over a vast amount of largely irrelevant paper relating to this property and PP & A since 1986. There is no information, however, concerning Debtors' partnership distributions or the actual sale of the property. These are the type of records that would be more helpful to the trustee, as opposed to, for example, the tenant handbook.

The deficiencies of Debtors' financial records are even more pronounced for the year 1993. The only records for 1993—the year Debtors filed their petition—are copies of the statements and cancelled checks from the Citizens account, and Patricia's post-petition check register. Putting this in perspective, the Citizens account was only one of at least six bank accounts Debtors had before July,

1993. Debtors have submitted no information on the other accounts. Nor have Debtors produced any pre-petition records on the brokerage accounts.

In addition, Debtors have failed to produce records relating to their rental properties, with the exception of an occasional receipt for expenses attached to Debtors' tax returns. There are no ledgers for rental income received, and there is no indication of where Debtors deposited such money. *See Cox,* 904 F.2d at 1402 (citing debtors failure to keep records of rental income as failure to adequately keep records).

Debtors have also failed to turn over any documents reflecting the numerous transfers of personal property. Debtors sold significant items, such as snowmobiles, fur coats and expensive jewelry. According to the Statement and their § 341 meeting testimony, Debtors received more than $40,000 cash in connection with these sales. *This is a significant amount, and without any records, the trustee has no means to be able to reconstruct the sales.*

Most significant, however, is Debtors' failure to produce any records whatsoever pertaining to the numerous transfers of real property that Debtors entered into on the eve of bankruptcy and just prior to the effective date of Minnesota's more restrictive homestead exemption law. Not only are Debtors' records lacking in information on the purchase and ownership of the properties, such as deeds, mortgages, or copies of the contract for deed on the Lindawood property, but there are no records pertaining to the sale of the properties. Debtors testified that they had an appraisal to ascertain a fair price for the Timber Hills property, but have not produced a copy of the appraisal. *See Nisselson v. Wolfson (In re Wolfson),* 139 B.R. 279, 286 (Bankr.S.D.N.Y.1992), *aff'd,* 152 B.R. 830 (S.D.N.Y.1993) (listing the failure to produce documents relating to appraisal as an example of the failure to keep adequate records under § 727(a)(3)).

Finally, Debtors have provided no information regarding the mortgage on their homestead. They testified that they paid down the mortgage with the proceeds from the sale of the other properties, and copies of the checks to the mortgage company are included in the checks from 1993 from the Citizens account. However, this is the only information that relates to the homestead mortgage. Debtors have not provided any underlying documents to the mortgage or the property. These are basic records any person would keep, particularly when Debtors were so concerned with paying off the mortgage. *See Cox,* 904 F.2d at 1402 (failure to keep records regarding payment of mortgage and underlying documents constitutes failure to keep records under § 727(a)(3)).

Debtors place much emphasis on the fact that they produced two boxes full of documents. However, it is not quantity, but quality, that is relevant to the § 727(a)(3) inquiry. *Bailey,* 145 B.R. at 924. Here, the quality is clearly lacking. At least four-fifths (⅘) of the documents originally produced consist of worthless paper relating to Northwoods. This mountain of paper was a "red herring", designed to detract the Movants from the lack of records regarding Debtors' pre-petition transfers or financial condition.

The correct test is whether the records available present an *accurate* and *complete* account of the Debtors' financial affairs. Debtors have engaged in multiple transactions in anticipation of bankruptcy, and have had various bank and brokerage accounts. Yet, absent extensive investigative maneuvers, it is virtually impossible from the sparse records available to reconstruct Debtors finances for the two years prior to the petition date. Yet this is exactly what the Debtors insist the trustee do. According to Debtors, the trustee has enough information to discover the relevant facts for himself.[7]

---

**7.** Specifically, Debtors argue that "the Movants have this information or could easily get it. The Puloses have identified the banks they held accounts at and identified FBS Mortgage as the holder of the mortgage on their homestead.... [I]t is impossible to believe that, working together, the largest bank in Minnesota, the second largest law firm in Minnesota, and a panel trustee who claims to have handled 10,000 chapter 7 cases over the last 10–12 years cannot figure out how to obtain these checking and mortgage records under the rules of civil procedure." Debtors' Objection to Motion for Summary Judgement, at 7–8.

Contrary to Debtors' beliefs, the *debtor has the obligation* to compile the financial information, and must provide more than just a vague "hodge podge" of financial transactions. *In re Harper*, 117 B.R. 306, 310 (Bankr.N.D.Ohio 1990). Debtors have not met this obligation. Accordingly, the Movants have met their burden of establishing that the Debtors have failed to keep adequate records.

### 2. *Justification for failure to keep adequate records*

 If the debtor has not kept sufficient records, the next inquiry is whether the debtor's failure to keep the records is justified. The test for justification is an objective one. It is not necessary to find that debtor intended to conceal financial conditions, but only that the lack of records was unjustified. *Bailey*, 145 B.R. at 924. The debtor cannot assert an honest belief that he or she did not need to keep the records. Instead, debtors have a duty to preserve those records that others in like circumstances would ordinarily keep. *Meridian Bank*, 958 F.2d at 1231; *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 117 (Bankr.E.D.N.Y.1993).

 Some factors to consider in whether the debtor's failure to keep records is justified include the debtor's education, sophistication, and business experience, size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist. *Middlefield Banking Co. v. Kassoff (In re Kassoff)*, 146 B.R. 194, 200 (Bankr.N.D.Ohio 1992); *Wolfson*, 139 B.R. at 287; *Anderson v. Wiess (In re Wiess)*, 132 B.R. 588, 592 (Bankr.E.D.Ark. 1991). More sophisticated business persons are generally held to a high level of accountability in recordkeeping for purposes of

§ 727(a)(3). *Meridian Bank*, 958 F.2d at 1231. The more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records are supposed to be. *Hillis v. Martin (In re Martin)*, 124 B.R. 542, 543 (Bankr.N.D.Ind.1991).

Debtors sole explanation for the failure to keep adequate records is that they forwarded all financial information to their accountant for preparation of tax returns, and then discarded the non-pertinent records after the tax returns were filed.[8] Even if this is true, this is not a suitable justification as a matter of law.

Debtors are both highly sophisticated business people with sound business acumen. Debtors have been officers, directors and shareholders in corporations. They both draw a significant salary in their current employment, and receive additional compensation from their various investments. Debtors must have been well aware of the need to keep books pertaining to their finances and businesses. In light of Debtors' sophistication, I could not reasonably conclude that their failure to keep records was justified. *See also Meridian Bank*, 958 F.2d at 1231–32; *Wolfson*, 139 B.R. at 287 (debtor, who was an officer, director, shareholder, consultant, and had been involved in the sales of corporations, had a greater responsibility to maintain records).

Moreover, the records produced by Debtors demonstrate their remarkable ability to retain documents for income tax purposes. The tax returns are replete with copies of invoices and receipts for the most detailed, but inexpensive, expenses. Yet, Debtors have failed to produce documentation for the sale of over $750,000 worth of real property on the eve of bankruptcy. Based on the

In support, Debtors cite Judge Kishel's decision in *Mathern*. *Mathern*, however, is inapposite. In *Mathern*, the debtor had produced "a mountain of documents." 137 B.R. at 317. The creditors moved for summary judgment based on the debtor's failure to produce a comprehensive summary of the documents produced. *Id.* Judge Kishel rejected this argument, holding that "somewhere within the 'mountain of documents', in the form of some or even all of them, there is a perfectly adequate recapitulation of [the debtor's] financial position." *Id.* at 318. The Movants in the present case, however, could

not ascertain Debtors' finances from the documents produced. Simply put, no matter how hard they searched, there are no such documents that relate to Debtors' pre-petition transfers or their financial condition.

8. Debtors also contend that they have no documents prior to April, 1991 since all their records were at CDS. As I previously mentioned, my decision is based entirely on the facts between May, 1991 and December, 1993.

**693**

facts, it would be unreasonable to conclude that Debtors' failure to keep adequate records was justified.

Accordingly, Debtors have failed to establish that there is a material fact issue as to justification for failure to maintain adequate records. As a result, the motion for summary judgment should be granted.

## *ORDER GRANTING MOTION FOR SUMMARY JUDGMENT*

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. The motion for summary judgment by the Movants is GRANTED; and

2. Debtors discharge is DENIED pursuant to § 727(a)(3) of the Code.