**In re Arthur Lee SIGUST, Bettye Jean Sigust, Debtors.**

**Michael McDonough, d/b/a the Levee Club, Plaintiff,**

**v.**

**Arthur Lee Sigust, Bettye Jean Sigust, Defendants.**

**Bankruptcy No. 99–81471. Adversary No. 00–AP–8001.**

United States Bankruptcy Court, W.D. Louisiana, Alexandria Division.

Sept. 19, 2000.

Harvey R. Lexing, Monroe, LA, for Debtors.

Bradley Drell, Alexandria, LA, for Plaintiff.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter comes before the Court on an Objection to the Discharge. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference from the District Court pursuant to Uniform Local District Court Rule 83.4.11, incorporated into Local Bankruptcy Rule 9029.3. No party at interest has sought to withdraw the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these reasons, there will be judgment in favor of the Plaintiff denying the debtors a discharge.

## FINDINGS OF FACT

Plaintiff instituted this action under 11 U.S.C. § 523 and alternatively under 11 U.S.C. § 727. Prior to trial, the Plaintiff withdrew all of the allegations under § 523, and proceeded to trial solely under the alternative theories of § 727.

Mr. McDonough, Plaintiff herein, formerly operated a bar known as the Levee Club in Vidalia, Louisiana. The Levee Club was owned by The Levee Club, Inc., an extant corporation whose sole shareholder is Mr. McDonough. The Corporation also held a license to operate video poker machines, of which Mrs. Bettye Jean Sigust, a local schoolteacher, was a regular customer.

Mrs. Sigust issued a number of checks over the period of her patronage of the Levee Club. Mr. McDonough would give her cash from the business receipts in exchange for the checks. When she ran out of checks, she issued I.O.U.'s. She picked up a number of the checks, but by the time the Levee Club ceased operations, she owed a total of $8,400.00. *Exhibit P–1, in globo.* The funds were used by her to play the video poker machines in the establishment. No food was sold there, and although liquor was sold on the premises, Mrs. Sigust drank only diet cokes while visiting the club. After the club closed down, Mr. McDonough presented Mrs. Sigust's checks to her bank, Concordia Bank and Trust Company, only to learn that her account had been closed. He then sought to have the checks collected by the District Attorney and made demand on her pursuant to Louisiana's "NSF" check statute. Frightened, Mr. and Mrs. Sigust contacted their attorney, and this bankruptcy was filed.

Mr. Sigust acknowledged awareness of his wife's gambling habit and her tendency to give money to her family members. These issues caused strain within their marriage. At one time, they were "separated," but, for the most part, lived apart for long periods. During a period of time they lived together in Greenbelt, Maryland, she ran up large phone bills and had checks bounce. This caused him to take her off his accounts. Thereafter, each had separate checking accounts; he with a credit union with his employer, and she with a Louisiana bank.

Mr. Sigust retired and relocated to Louisiana shortly before receiving the demand letter on the checks. Also, in roughly the same time frame, Mrs. Sigust's employ-

ment terminated. While the School Board's records may show that she retired, she insisted at trial that she was forced to resign due to illness. She testified that she was ill for quite some time, even paralyzed for a period. She stated that at one time, her condition was thought to have been a mental illness, but she was ultimately diagnosed with myelitis the month prior to the trial. She is responding to medication, but maintains her memory is impaired from the illness. When she terminated her employment, she had a balance accumulated with the State Teachers Retirement system, which was disbursed to her post-petition. This fund is not listed in the schedules, nor is it claimed as exempt.

Mrs. Sigust graduated from Southern University in Baton Rouge, Louisiana, with a B.S. in Education. Although she took post-graduate courses, she did not obtain a masters degree. Mr. Sigust graduated from Southern University in 1963, receiving a Bachelor's degree in Industrial Arts. He also holds a Masters Degree in Business Administration, which he received from Michigan State University. He also took numerous enrichment courses while in the military. He served as an officer in the United States Air Force, leaving the military in 1976, after service in Viet Nam. He was then employed by NASA, where he served as a civilian employee for abut 20 years, working in policy related areas as an advisor to the Department of Defense and other federal agencies and was active in the field of radio spectrum usage. He testified that he served on the President's National Security Advisory Committee. He retired with 35.5 years of combined federal civilian and military service and received many awards. He, too, described his retirement situation as not entirely voluntary on his part, suggesting that the term "business

process re-engineering" at his agency was a euphemism for a layoff.

Due to Mrs. Sigust's illness, Mr. Sigust was largely responsible for preparing the information for the bankruptcy filing. Debtors' schedules of financial affairs list their income as "Income other than from employment or operation of business" on the statement of financial affairs as only $18,000.00 for 1998 and $33,000.00 for 1999. However, the debtors filed joint tax returns for 1997, 1998, and 1999 with total income of $91,925.00, $153,554.00, and $72,214.00, respectively. *Exhibits P–5, 6 & 7* [1]. Mr. Sigust's explanation for the discrepancies and omissions is that he interpreted the form as asking for income from "business," and they were not in a "business." He offered no other explanation for the understatements in the amount of income.

Debtors failed to list any bank accounts in their schedules, despite having an active checking account at Concordia Bank and an account which Mr. Sigust still maintains at his Credit Union for the purpose of paying a car loan. *See Answer to Request for Production, Exhibit P–4,* (in which debtors acknowledge a "residual membership account at NASA Credit Union.") Debtors also failed to list the distribution form Mr. Sigust's retirement in 1998 on in response to Question 11 of the Financial Affairs, asking for information on accounts that were "closed, sold or transferred within one year immediately preceding the commencement of the case" including "pension funds." Debtors acknowledge that neither his pension nor her retirement accounts are listed on Schedule C.

Debtors did not list any losses from gambling at Question 8 on the Statement of Affairs, but characterized the claim due the Levee Club as an unsecured loan for "gambling" on Schedule F. Further, Debtors had other losses from gambling that

---

1. The 1998 return reflects gross income from employment of $97,858.00, $21.00 in interest, and distributions from pensions and annuities of $57,682.00. Mr. Sigust testified that a portion of the distribution from his pension

fund was used to refinance their Louisiana residence, but the details of that transaction, like many aspects of the Debtor's financial situation, remain ambiguous.

are not represented by the debt owed to the Levee Club. Mrs. Sigust picked up several checks from Plaintiff that are not included in the $8,400.00 debt but do represent additional gambling losses. Mrs. Sigust also had losses from Louisiana lottery scratch off tickets that were not listed.

The schedules also do not reflect the fact that Mr. Sigust has a term life policy as a retired government employee, nor do the schedules reflect that Mrs. Sigust was an endorser on at least one of the claims listed, evidently a loan obtained for one of her nieces to attend school, despite Mr. Sigust having cautioned her frequently against signing such documents.

Debtors owned a home in Louisiana, and Mr. Sigust inherited an interest in 2.5 acres in Caldwell Parish from his parents. The inherited property was not listed in the schedules. There was discussion at the § 341 meeting about an amendment to the schedules to list the property, but no amendment to the schedules materialized before trial.

Finally, Debtors have no financial records. Mr. Sigust concedes that he and his wife are "poor financial managers" and have no savings. They do not keep their checking account records but simply "review the monthly bank statements for accuracy and discard them." *Answer to Request for Production, Exhibit P–4.* Conceding that they failed to "dot all the i's and cross all the t's" in the petition and schedules, Mr. Sigust insists they had no intention to defraud the government, and that he is a part of that government.

Post-trial, debtors filed amended schedules to cure the deficiencies revealed at trial. These amendments are discussed *infra.*

## APPLICABLE LAW

Prior to focusing on the bankruptcy law issues in this case, these reasons must first address the defendants' claim that the debt at issue is unenforceable and that the Plaintiff here lacks standing to proceed. These reasons reject both of these contentions.

■ The thrust of the first contention is the long-established Louisiana public policy against enforcement of gambling debts codified in Louisiana Civil Code article 2983. As an additional argument focusing on the gambling nature of the debt at issue, the defendant asserts that the plaintiff, under the applicable state regulations on video poker machines, was forbidden to cash checks for Mrs. Sigust. These contentions must fail.

In *State v. Dean,* 99–475 (La.App. 3 Cir. 11/3/99); 748 So.2d 57, the Third Circuit Court of Appeal considered whether a conviction of issuing worthless checks was valid. Defendant asserted the prosecution was intended to collect a gambling debt. The Court noted that Civil Code article 2983 pre-dated the Louisiana Gaming Control law. It also noted that recent Louisiana cases allowed recovery. *See TeleRecovery of Louisiana, Inc. v. Major,* 98–1191, 98–1192 (La.App. 1 Cir. 5/18/99); 734 So.2d 947; and *TeleRecovery of Louisiana, Inc. v. Gaulon,* 98–1363 (La.App. 5 Cir. 6/1/99); 738 So.2d 662. Those cases held that gambling markers were enforceable negotiable instruments. In *Dean,* the Court noted that the acceptance of personal checks is not prevented by the Gaming Control Law. *Dean,* 748 So.2d at 60. The defendant there, like Mrs. Sigust, could have chosen to cash the check and leave the establishment. It also rejected the defendant's contention that the casino could not have legally cashed the check. It noted that La. R.S. 27:101 prohibits the acceptance of certain type of instruments for security for gambling debts or in exchange for cash, for example, payroll or family assistance checks, but did not prohibit the cashing of personal checks. Similarly, the check cashing prohibitions for video poker establishments only prohibit cashing an "identifiable payroll check" or a "check that represents a Family Independence Temporary Assistance Program (FITAP), Temporary Assistance for Needy

Families (TANF), or supplemental security income payment." La. R.S. 27:322. The checks at issue in this case are personal checks and do not fall within the prohibitions outlined in the statute.

[2] Turning to the standing issue, defendants maintain that the action should have been brought in the name of The Levee Club, Inc., of which the plaintiff is a stockholder. Thus, defendants assert, the plaintiff is not a creditor. Defendants raised this issue at trial, based on the testimony of Mr. McDonough, and by a post-trial Motion to Dismiss. Plaintiff, in turn, filed a post-trial Motion to Amend Pleadings to Conform to Evidence, under F.R.C.P. 15, made applicable to Adversary Proceedings in Bankruptcy under F.R.B.P. 7015. As noted by Plaintiff, the instruments at issue are bearer paper. Moreover, the defendants' answer to the complaint acknowledges that the instruments were given to Mr. McDonough, and the Joint Pre-trial Stipulation acknowledges again that the instruments were given to Mr. McDonough. The defendants' motion will be denied, and, although perhaps unnecessarily, on these facts, the plaintiff's motion will be granted.

Turning finally to the objection to discharge, 11 U.S.C. § 727(a) provides:

The Court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently made a false oath or account...

The test for an objection to discharge was set forth by the Fifth Circuit in *In the Matter of Beaubouef,* where the Court observed:

The plaintiffs [have] the burden of proving that: (1) [Debtor] made a statement under oath; (2) the statement was false; (3) [Debtor] knew the statement was false; (4) [Debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. See e.g., *In re Sapru,* 127 B.R. 306, 314 (Bankr.E.D.N.Y.1991). The elements of an objection to discharge under § 727(a)(4)(A) must be proved by a preponderance of the evidence. See *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991). False oaths sufficient to justify the denial of discharge include "(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings." 4 Collier on Bankruptcy ¶¶ 727.04[1], at 727–59 (15th ed.1992).

*In the Matter of Beaubouef,* 966 F.2d 174 (5th Cir.1992).

Section 727(a)(3) is intended "to give the trustee, creditors, and the court complete and accurate information concerning the status of the debtor's affairs and financial history, and to test the completeness of the disclosure requirements to a discharge." *In re Pulos,* 168 B.R. 682 (Bankr.D.Minn.1994). Once the plaintiff has established the inadequacy of the debtors' records, the burden shifts to the debtor to prove that the failure to keep same is justified under the circumstances. If the explanation is not sufficient, debtor does not receive a discharge. Factors in determining the adequacy of the debtors' records include the "education, sophistication and business experience, size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist." *Id.* at 692. More sophisticated business persons are held to a higher level of accountability. *Id.* citing *Meridian Bank v. Alten,* 958 F.2d 1226 (3rd Cir.1992). Plaintiff here cites *In re Trogdon,* 111 B.R. 655 (Bankr.N.D.Ohio 1990). There, a consumer debtor em-

ployed by the United States Government, Defense Department, was denied a discharge. The debtor there did not maintain a check register, and did not keep them. He simply discarded them as he opened new boxes of checks. Also, he did not maintain checks once they cleared his bank. The debtor was unable to explain an overpayment by the government of a job related move in the amount of $5,880.04. The court observed:

> Debtor is intelligent and college educated. While his financial dealings are fairly simple and uncomplicated, his records were inadequate under the circumstances. The absence of checks, check registers or receipts to substantiate major payments on items including payoff of student loans and appliance loans, frustrates any attempt to determine Debtor's financial history and transactions.

*In re Trogdon,* 111 B.R. at 659.

Here, the debtors' explanations for the omissions are preparer error, or strained explanations, such as claiming they were not in business, and did not have to report their income, or failing to list a bank account in Maryland, because it was only a "residuary" account. Debtors not only understated their income, they omitted bank accounts, pensions, and an interest in inherited property. Although it was suggested at the § 341 meeting that the schedules be amended to list the inherited property interest, no amendment was filed prior to trial.

In *Beaubouef,* the debtor had amended the schedules, but failed to clear up all the inconsistencies and omissions. The bankruptcy court determined that this constituted reckless indifference to the truth and established the requisite intent to deceive. The Fifth Circuit affirmed. It noted:

> "Full disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules serve the important purpose of insuring that adequate information is available for the trustee and creditors without need for

investigation to determine whether the information provided is true."

966 F.2d at 178 (Citation omitted).

Mrs. Sigust entrusted the preparation and filing of the schedules to Mr. Sigust. He stated that they were "under pressure" because of the potential prosecution of Mrs. Sigust on the checks. He acknowledged that the schedules do not even reflect that they own a television; but, reflects they have a monthly utility expense for "cable". He acknowledged that he was aware of her retirement account, and lists his own as exempt, and as a source of income (itself grossly understated), but not on Schedule B. Despite Mr. Sigust's testimony that he lived in the Washington, D.C., Metropolitan area for much of their married life, he did not even list the prior address on the Statement of Affairs, responding, instead, "None."

For reasons that remain unclear, these debtors have not availed themselves of the opportunity to amend the schedules prior to trial. At best, the debtors did produce some information in response to interrogatories and in response to requests for production of documents. *Exhibit P–3, P–4.* Even these documents are evasive. Debtors at no time in the original schedules or the discovery responses listed the closed account at Concordia Bank. The listing of the account at the NASA Credit Union as a "residual membership account" is not a forthright answer to a question pertaining to requests for bank statements for all accounts.

This Court can only conclude that the debtors have been recklessly indifferent to the truth. Three is no justification for the extensive omissions in the debtors' schedules. Nor do we find any justification for debtors' failure to maintain financial records. Both debtors are well-educated. Mr. Sigust's career is a particularly distinguished one. Despite having an MBA degree, and working in national security and highly technical fields, he does not keep even the most rudimentary records other than copies of tax returns.

Without such records, the trustee and creditors are at a loss to review the transactions regarding the refinancing of debtors' residence, to determine the disposition of the pension funds they have received, or to explain any routine financial transaction.

These debtors, much like the debtor in *Trogdon, supra,* must fail the test. The post-trial amendments to the schedules do not change the result.[2] Obviously, this Plaintiff and the Court cannot retest the accuracy of the amended schedules where the trial has already occurred. Yet, the Court notes that the amendments do not clear up the omissions and inconsistencies in the original. Debtors still do not list a television in their household goods, but list one under "books, pictures and other art objects." The life insurance policy is listed in the amended schedules. Mrs. Sigust's pension is listed on Schedule B, but his is not listed except as exempt on Schedule C. The market value of her pension is listed on Schedule B at $2,844.33, but is listed on Schedule C as $1,999.03. The most curious entry in the amended schedules concerns losses from gambling. The amended schedules acknowledge a loss of "cash money" approx ($100.00) from "LA Lottery scratch off games and bingo" in 1999, with "dates unknown." This is scarcely reconcilable with the uncontroverted evidence introduced at trial that Mrs. Sigust lost over $8000.00 at the Levee Club in 1999. The checks and I.O.U.'s are dated. Are debtors now claiming that the funds at issue in this Adversary Proceeding were not losses incurred in gaming? Are they waiving the defense that the same are uncollectible under Louisiana Law? Clearly, the post-trial amendments, rather than exculpating debtors, only demonstrate their reckless indifference to the truth, and, thus, like the debtor in *Beaubouef,* their intent to deceive.

2. The trial was held August 11, 2000. The amended schedules were filed August 25, 2000.

## CONCLUSION

From the forgoing reasons, this Court finds and concludes that there be judgment in favor of the Plaintiff, sustaining the objection to the Discharge of the Debtors. The Motion to Amend the Complaint to conform to the evidence is granted. The Defendants' Motion to Dismiss is Denied. A separate and conforming order will be entered.