**In re Thomas W. CAULFIELD, Debtor.**

**BARRISTERS ABSTRACT CORPORATION, Plaintiff,**

v.

**Thomas W. CAULFIELD, Defendant.**

**Bankruptcy No. 093–72000–511. Adv. No. 093–7189–511.**

United States Bankruptcy Court, E.D. New York.

Feb. 28, 1996.

Finkel Goldstein Berzow & Rosenbloom by Harold S. Berzow, New York City, for Plaintiff.

Law Offices of Richard G. Gertler by Richard G. Gertler, Garden City, New York, for Defendant–Debtor.

### DECISION AFTER TRIAL

#### (Objection to Discharge and Exception to Dischargeability)

MELANIE L. CYGANOWSKI, Bankruptcy Judge:

Thomas W. Caulfield ("Caulfield" or "Debtor") filed a voluntary petition for relief under Chapter 7 on June 18, 1993. Barristers Abstract Corporation ("Barristers") timely filed the above-captioned adversary proceeding seeking a judgment barring the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5) and excepting the debt owed to it from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(4). The Court conducted a trial on March 1, 1995, at which it heard the testimony of Thomas Caulfield, Dorothy Elliot and James Mercaldo and received Plaintiff's Exhibits 1

through 15 and Defendant's Exhibit A into evidence pursuant to stipulation of the parties. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

### The Pleadings

Plaintiff's first claim alleges that Caulfield has concealed, destroyed or failed to keep or preserve sufficient recorded information from which his financial condition or business transactions may be ascertained and has failed to explain satisfactorily a loss of assets or deficiency of assets to meet his liabilities. The first claim seeks judgment barring the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5).

Barristers' second claim alleges that Caulfield transferred his interest in real property located at 192 Dean Street, Brooklyn, New York ("192 Dean Street") for inadequate consideration at a time when he was either insolvent or by such transfer rendered insolvent, and that the transfer was fraudulent as to Barristers under New York's Debtor and Creditor Law and thus constitutes a ground to except the debt owed to Barristers from discharge pursuant to 11 U.S.C. § 523(a)(4). In addition, the second claim alleges that Caulfield concealed the fact that another person had a secret interest in 192 Dean Street, and falsely represented to Barristers that he owned the whole property without disclosing the interest of anyone else. The second claim seeks a judgment declaring Caulfield's debt to Barristers to be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(2)(B).

In his answer, Caulfield denies the complaint's allegations, and raises several affirmative defenses. First, Caulfield claims that he has kept sufficient records from which his financial condition and business transactions can be ascertained. He alleges that he has "adhered to the Internal Revenue Service requirement, and generally accepted accounting principles which require that two to three years of financial records be kept."

Secondly, Caulfield claims that any failure to keep records is justified because (1) Barristers prevented him from entering his business premises in 1991, removed certain property from the premises and placed it in the street; and (2) he became severely ill and had to relocate to a small one-bedroom apartment with "severe space limitations", so he kept only essential records.

As a third affirmative defense, Caulfield alleges (1) that he purchased 192 Dean Street together with Dorothy Elliot in 1982 and that in 1985, she bought his interest for approximately $90,000; (2) that at the time of the purchase, he owed no matured debt to Barristers and, therefore, he was not a judgment debtor at the time of the transaction; and (3) that he was not insolvent at the time of the transfer and was not rendered insolvent thereby.

As a fourth affirmative defense, Caulfield alleges that Barristers fails to state a claim under § 523(a)(2)(A).

Lastly, Caulfield alleges that he never represented to Barristers that he owned the entire property unencumbered by any other interests. Even if he did, he alleges that Barristers did not rely on any such representation, and that he did not intend to deceive creditors.

### Factual Background

In 1980, Caulfield and Dorothy Elliot ("Elliot") agreed to each contribute approximately $8,000[1] to buy property located at 110 Butler Street, Brooklyn, New York (the "Butler Street Property"). Caulfield contributed his share of the purchase price, and Elliot's mother, Anna T. Guest a/k/a Mrs. Walter Guest ("Guest"), contributed Elliot's share on her behalf. Although Elliot testified that she had a bank receipt for Guest's cashier's check, Tr. at 13, it was not produced at the trial.

1. The record is unclear as to the amount each party contributed. Elliot testified that Caulfield contributed $8,000 and her mother contributed $8,000. Caulfield testified that each contributed between $6,000 and $8,000, and part of Elliot's contribution may have been in the form of a loan from her mother. An assignment of 50% of Caulfield's interest in the property to Guest recites that it was in consideration for her contribution of $9,500. Whatever the amount contributed by each party, it is not germane to the issues presented.

Caulfield, in consideration for Guest's contribution, executed a document entitled "Partial Assignment" which purported to assign to Guest an undivided fifty per cent (50%) of his interest in the Butler Street Property. (Pl.Ex. 8). There was no evidence as to whether this document was recorded. In addition, Caulfield and Guest executed a document entitled "Agreement" which recited that in consideration for Guest's contribution, Caulfield assigned her "a ½ undivided interest in THE PROPERTY ... with a right to share in the proceeds of any sale...." (Pl. Ex. 12). Another provision of the Agreement appointed Elliot as Guest's "agent and attorney-in-fact for all transactions concerning THE PROPERTY."[2] Id.

However, the deed to the Butler Street Property was in Caulfield's name alone. Elliot's explanation was that there was a tax lien "against my name along with my ex-husband." Tr. at 11–13. Caulfield knew of the lien prior to closing, Tr. at 117, and knew that it "would have been an impediment to getting financing." Tr. at 117. Although Elliot testified that there is a writing which reflects the agreement with her mother that Elliot was the real party in interest in the Butler Street Property, no such writing was produced at trial, except the Agreement referenced above.

Caulfield also testified as to his belief that Elliot had a one-half interest in the Butler Street Property as a result of her contribution, or her mother's contribution on her behalf, of one-half of its purchase price. He stated that "basically we bought the property on an equal 50–50 basis, and we got 6,000 or 8,000, whatever, from her mother." Tr. at 133. He also stated that he didn't distinguish between Elliot and Guest, and did not recall why Guest's name was not on the deed. Tr. at 137, 138.

Caulfield and Elliot lived at the Butler Street Property for about two years. Tr. at 17–18. They also rented a portion of it to third parties, who paid rent by check to Caulfield, Tr. at 19, which was used to pay the mortgage. Tr. at 22, 46. Caulfield and Elliot each paid some of the expenses on the property. Tr. at 21.

In late 1982, they sold the Butler Street Property and used the proceeds to purchase 192 Dean Street from Charles Bouchard. Tr. at 23–24, Pl.Ex. 10. Bouchard, Elliot and Caulfield each signed the contract of sale dated November 19, 1982. Caulfield and Elliot gave a $10,000 downpayment, and Bouchard took a purchase money first mortgage for the balance of $90,000. Tr. at 25. The mortgage note was signed by both Caulfield and Elliot. The sum of $90,000 was "payable Nine Hundred Seventy Five ($975.00) Dollars monthly, representing interest only ... until the first day of February, 1984, when the entire principal balance, plus accrued interest, if any, shall become due and payable." (Pl.Ex. 11).

In addition, by agreement dated January 31, 1983, which defines Caulfield and Elliot as "Landlord" and Charles Bouchard as "Tenant", the parties agreed that Bouchard would rent a basement apartment at 192 Dean Street. (Pl.Ex. 9). Caulfield, Elliot and Bouchard all signed the agreement. Tr. at 47.

Elliot signed the contract of sale, mortgage note and rental agreement because she believed she "was liable on the mortgage and had a ½ interest in the building." Tr. at 48. However, title to 192 Dean Street was in Caulfield's name alone, due to the existence

---

**2.** The Agreement provides in part as follows:
 WHEREAS, THOMAS W. CAULFIELD (hereinafter "CAULFIELD") purchased the property, 110 BUTLER STREET (hereinafter "THE PROPERTY") BROOKLYN, NEW YORK on August 27, 1980 and
 WHEREAS, ANNA GUEST (hereinafter "GUEST") contributed a substantial portion of the purchase price for the purchase of THE PROPERTY and
 WHEREAS, CAULFIELD and GUEST wish to define their rights and obligations as to THE PROPERTY.

 NOW THEREFORE, in consideration of one dollar and other valuable consideration the parties hereto agree as follows:
 1. CAULFIELD hereby assigns as ½ undivided interest in THE PROPERTY to GUEST, with a right to share in the proceeds of any sale of THE PROPERTY.

 \* \* \* \* \* \*

 3. GUEST appoints DOROTHY ELLIOT as her agent and attorney-in-fact for all transactions concerning THE PROPERTY.
(Pl.Ex. 12).

of the tax lien, which had not been satisfied. Pl.Ex. 14; Tr. at 28, 49, 118. Elliot was not present at the closing in which title passed from Bouchard to Caulfield. Tr. at 26.

At some point thereafter, Caulfield refinanced the mortgage on 192 Dean Street with Citibank. Tr. at 30. Although Elliot did not participate in the loan application process, and did not sign any documents in connection with the refinancing, Tr. at 30, it was done with her consent. Tr. at 49. The proceeds from the refinancing were used to pay off the mortgage to Bouchard and the balance was used to renovate the plumbing and electrical wiring, and to install new ceilings and floors. Tr. at 50. Caulfield did not disclose to Citibank that Elliot claimed an interest in the property. Tr. at 118.

The property at 192 Dean Street was a duplex, and Caulfield and Elliot rented out the other apartment. Tr. at 31. The tenants paid rent to Caulfield, Tr. at 31, which was used to pay the mortgage and expenses on the property. Tr. at 51. Caulfield deposited the rent checks into a checking account, Tr. at 112, out of which he wrote checks to pay expenses. Tr. at 113. In addition, Elliot helped to pay the expenses, Tr. at 32, but did not recall whether she took any income tax deductions for her ownership in either the Butler Street Property or 192 Dean Street. Tr. at 33.

The debt which Caulfield owes to Barristers arises from a dispute concerning premises located at 175 Court Street, Brooklyn, New York ("175 Court Street"). Caulfield was a tenant at 175 Court Street, with his real estate brokerage, Meridian Development Corp., d/b/a Meridian Realty ("Meridian"). Tr. at 69. Caulfield, a licensed real estate broker, Tr. at 99, was the sole officer, director and shareholder of Meridian. Tr. at 98. Caulfield had a contract with the building's owner to buy it, Tr. at 69, and then allegedly discovered that there "were problems with the building." Tr. at 127. He eventually commenced an action for specific performance of the contract. *Id.* In turn, the seller commenced an eviction proceeding against Caulfield. Tr. at 70.

In 1984, James Mercaldo, the President of Barristers, acted as agent for another purchaser of the premises, Mr. Palma. Tr. at 68. One of the conditions of Mr. Palma's purchase of 175 Court Street was that the seller get a judgment of possession against Caulfield, which he did before closing, and that Barristers be substituted in the action as the landlord. Tr. at 70–72.

Mercaldo first met Caulfield in April, 1984, when he went to the premises to tell Caulfield that Barristers was purchasing the building and to ask him when he would vacate the premises. Tr. at 74. Caulfield told Mercaldo that he would not leave, as "he was equitable owner of the building." Tr. at 74. Mercaldo also met Dorothy Elliot at that time. Tr. at 75. He testified that during his conversation with Caulfield, he referred to Elliot as Caulfield's wife, and was not corrected, Tr. at 83, but both Elliot and Caulfield denied that portion of the conversation. Tr. at 125. Mercaldo had no further contact with Elliot, "other than to say hello on the street." Tr. at 76. Nonetheless, he believed that Caulfield and Elliot were married because he had "asked around, different people in the neighborhood. I'm friendly with a lawyer who works two stores away ..." Tr. at 76. He also discussed the subject with one of Caulfield's former employees. Tr. at 93.

At some point after the April, 1984 conversation at 175 Court Street, Mercaldo checked to see who owned Caulfield's residence at 192 Dean Street, and found that title was in Caulfield's name alone. Tr. at 73, 83.

However, on May 3, 1985, while the litigation with Barristers was pending, Tr. at 93, Elliot purchased 192 Dean Street from Caulfield "because he needed his money out of the building, his half interest, because he was having problems in his business, and he wanted to do some other kind of business ventures." Tr. at 27. By that time, the IRS lien had been satisfied. Tr. at 39. Elliot applied to Citibank for a mortgage, but did not tell Citibank that she already had a one-half interest in the property. Tr. at 39.

Elliot was present at the May 3, 1985 closing at which she purchased Caulfield's interest in 192 Dean Street. Tr. at 43. She and Caulfield determined the selling price of

$319,000 by having the property appraised, Tr. at 44, 53, 58, and agreed on a price for Caulfield's interest by taking the market value of the property, subtracting the amount of Caulfield's outstanding mortgage with Citibank, and dividing by 2.[3] Tr. at 120. Caulfield received approximately $90,000 at the closing. Tr. at 57.

A title search of 192 Dean Street would not reveal that Elliot had any interest in the property prior to the May 3, 1985 closing. Tr. at 135.[4]

After the closing, Caulfield and Elliot continued to live together at 192 Dean Street for several years, Tr. at 42, 111, but Caulfield paid Elliot $800 per month as rent, by personal check or cash, Tr. at 63, 111, which she reported as income on her taxes. Tr. at 66. She did not give Caulfield receipts when he paid by cash. Tr. at 111.

Caulfield invested the entire proceeds from the sale to Elliot of 192 Dean Street in Meridian, Tr. at 122, which is now defunct. Tr. at 123, 130. He testified that

> [s]ome of the money went toward shoring up cash flow; some of the money went toward litigation fees in connection with my specific performance action to recover the building.... [T]he bulk of the money ... was used to open a large office up on Montague Street in Brooklyn and to totally renovate that space.... [A]nother portion of the money was used to open an office on Flatbush Avenue in Brooklyn.

Tr. at 124.

However, no records exist to show how he spent the money. Tr. at 124.

Caulfield left 192 Dean Street in early 1992 and moved, due to "medical problems," to a one bedroom apartment with one storage closet. Tr. at 129.

At some point not disclosed by the record, Caulfield successfully set aside the judgment of possession against him respecting 175 Court Street, and Barristers continued with litigation[5] to evict Caulfield from the premises. Tr. at 72. Eventually, on August 13, 1991, Barristers obtained a judgment for approximately $72,000 against Caulfield, Tr. at 86, no part of which has been satisfied. Tr. at 72, 100. Caulfield vacated the premises at 175 Court Street in 1991. Tr. at 128.

The first time that Barristers learned of the transfer of 192 Dean Street was after Barristers obtained its judgment and prepared an abstract of title to give to the sheriff. Tr. at 77. Barristers then commenced an action to set aside the conveyance, Tr. at 94, which is still pending.

Caulfield is a lawyer, Tr. at 97, and currently supports himself by doing free-lance legal work and consulting. Tr. at 130.

He maintained a checking account in the year prior to the filing (1992), Tr. at 100, but not for the year or two prior to that. Tr. at 101. His financial records for the years prior to 1990 were "mostly in the form of checking accounts." Tr. at 102. For the most part, he preserved check registers, bank statements, paid bills and cancelled checks. Tr. at 100, 102. He did not keep a set of ledgers, Tr. at 102, and although he had a computer, he did not keep financial records on it. Tr. at 111. After he sold 192 Dean Street in 1985, he never kept more than 2 or 3 years' worth of records; he threw them away. Tr. at 102, 108–9. In particular, after he moved to the apartment in 1992, he discarded documents because he had limited storage space. Tr. at 129. He did not keep any documents

---

**3.** Although Elliot could not recall how much Caulfield's outstanding mortgage was, Caulfield testified that it is reflected on the closing statement (Pl.Ex. 6) as "Expenses seller paid to Citibank" and was in the amount of $148,736. Tr. at 120–21. Elliot received a credit at closing of $81,950 for her half of the equity, which is reflected on the closing statement as "Paid on contract." Tr. at 62, 121; Pl.Ex. 6. The closing statement also reflects that Elliot took out a $228,750.00 mortgage to purchase the property, referred to as "Mortgage proceeds paid at closing" on Pl.Ex. 6; Tr. at 121, and therefore that

Citibank believed that Elliot was purchasing the whole interest in 192 Dean Street. Tr. at 58.

**4.** Although Caulfield stated that he believed that the original mortgage to Bouchard (which Elliot signed) was recorded, Tr. at 136, Mercaldo testified that he conducted a title search of the property, and it was not. Tr. at 141.

**5.** There was a proceeding in landlord-tenant court, and a subsequent ejection proceeding in New York State Supreme Court. Tr. at 80.

concerning his ownership of either the Butler Street property or the 192 Dean Street Property, Tr. at 110, and discarded his tax returns for the years 1983 to 1985. Tr. at 114. Although he testified that he kept records for Meridian from 1981 until its demise, Tr. at 108, they were not produced at trial.[6]

In response to Barristers' request when it conducted his examination pursuant to Rule 2004, Caulfield gave Barristers all of the financial records he had. Tr. at 103, 104. Trial Exhibit 5 consists of copies of the records which Caulfield gave to Barristers and which were later returned to him. The exhibit consists of (1) monthly bank statements and copies of cancelled checks from an account at Suffolk County National Bank in the name of "Nora Caufeild" [sic] for the months of October, 1992 through October, 1993; and (2) monthly bank statements and copies of cancelled checks from an account at Marine Midland Bank in the names of Nora and Thomas Caulfield for the months of May, 1992 through September, 1993. Nora Caulfield is the Debtor's mother, and he had signatory power to her account. Tr. at 104–105. Caulfield also gave Barristers a copy of his 1991 tax return, Pl.Ex. 4; Tr. at 105, and a copy of an application for an extension of time to file his 1992 return. Pl.Ex. 3; Tr. at 106.

Although Caulfield claimed that other records were provided to Barristers, he gave no specifics:

Q: Would you agree with me that the records that I returned to you is what you gave to me?

 \* \* \* \* \* \*

A: I had, in response to an earlier request by you, I had sent you all of my original financial records with the understanding that they would be returned promptly to me. As you may recall, they remained in your possession for well over a month, I believe; so I don't really know, it is not easy to—I can't say for certain, there's no way for me to say for sure

whether this is everything I had provided to you earlier on.

Q: When you received the records back, you admitted you received them back, did you in some way check to see that what you received back was what you had originally given me?

A: No, actually I didn't at that time.

Tr. at 103–104.

Caulfield filed his voluntary petition for relief under Chapter 7 on June 18, 1993. His schedules disclose no debts to secured or unsecured, priority creditors. Rather, the only creditors are four unsecured creditors owed a total of $138,000. Barristers is owed $74,000, two other creditors are owed $39,000 in the aggregate based upon Caulfield's guarantee of corporate debts, and Southampton Hospital is owed the remaining $25,000. The Statement of Financial Affairs shows that Caulfield earned $11,000 in 1991, $19,000 in 1992 and $15,000 in 1993 from "Consulting & Legal Fees."

On September 9, 1993, the Court entered an Order, at Barristers' request, directing the examination of Caulfield pursuant to Fed. R.Bankr.P. 2004 ("2004 Order"). The 2004 Order also directed Caulfield to produce

(a) all documents relating or referring to the assets, liabilities, financial affairs, real property, deeds, mortgages, closing statements, leases, taxes, returns, including all corporate books and records, stock ledgers, shareholders agreements, corporate resolutions and minute books relating to all corporations the Debtor owned a legal or beneficial interest in within the past six (6) years; (b) all documents relating or referring to the business operations and activities of Meridian Development corporation. . . .

### DISCUSSION

A. *Section 523(a)(4)*

 Section 523(a)(4) provides that

---

6. Caulfield also claimed at trial that some of his personal records were lost in a flood at his Montague Street office in 1989. Tr. at 128.

818

(a) a discharge under section 727 ... does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

■ The burden is on the plaintiff to establish each of the elements of the statute by a preponderance of the evidence. *In re Kressner,* 164 B.R. 235 (Bankr.S.D.N.Y. 1994); *In re Stone,* 90 B.R. 71 (Bankr. S.D.N.Y.), *aff'd.,* 94 B.R. 298 (S.D.N.Y.1988), *aff'd.,* 880 F.2d 1318 (2d Cir.1989); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To sustain a cause of action for fraud or defalcation under Section 523(a)(4), the plaintiff must first establish that the debtor acted while in a fiduciary capacity. *In re Jacone,* 156 B.R. 740 (Bankr. S.D.N.Y.1993). The issue of fiduciary status within the meaning of Section 523(a)(4) is determined by reference to state law, *In re Kressner,* 164 B.R. 235 (Bankr.S.D.N.Y. 1994), although the concept is to be narrowly defined as a matter of federal law. *Stone, supra,* 94 B.R. at 302.

■ Several factors are considered in determining whether a debt was incurred while acting in a fiduciary capacity. First, the trust relationship must exist prior to the act creating the debt and without reference thereto. Second, the act creating the debt must have been done during the course of the fiduciary relationship. Third, the debt that arises from a breach of a fiduciary duty must be based on an express, technical or statutory trust. *In re Gans,* 75 B.R. 474, 489 (Bankr.S.D.N.Y.1987); *see also In re Marchiando,* 13 F.3d 1111 (7th Cir.1994).

■ Barristers introduced no testimony or evidence at trial to establish that Caulfield acted as a fiduciary at the time the debt was incurred. To the contrary, it is clear that Caulfield was simply a tenant in a building which Barristers purchased. A landlord-tenant relationship is not ordinarily a fiduciary one. *Top–All Varieties, Inc. v. Raj Development Co.,* 173 A.D.2d 604, 570 N.Y.S.2d 184 (App.Div.1991); *In re Carolina Steel Corp.,* 179 B.R. 413 (Bankr.S.D.N.Y.1995); *cf. NOPA Realty Corp. v. Central Caterers, Inc.,*

91 A.D.2d 991, 457 N.Y.S.2d 851 (App.Div. 1983). Therefore, the debt owed to Barristers cannot sustain an allegation of fraud or defalcation while acting in a fiduciary capacity.

■ A claim for either embezzlement or larceny under Section 523(a)(4), however, does not require a fiduciary relationship with the Debtor. *In re Kressner,* 155 B.R. 68, 74 (Bankr.S.D.N.Y.1993); *In re Balzano,* 127 B.R. 524, 532 (Bankr.E.D.N.Y.1991).

■ Larceny, for purposes of Section 523(a)(4), is defined by reference to federal common law, *In re Sokol,* 170 B.R. 556 (Bankr.S.D.N.Y.1994), *aff'd.,* 181 B.R. 27 (S.D.N.Y.1995); *In re Guerrerio,* 143 B.R. 605 (Bankr.S.D.N.Y.1992), as "the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner." *In re Balzano,* 127 B.R. 524, 532 (Bankr.E.D.N.Y.1991). The creditor must show that the debtor wrongfully took property from its owner, *In re Kelly,* 155 B.R. 75 (Bankr.S.D.N.Y.1993), with fraudulent intent. *In re Sokol, supra.*

Here, Barristers has not shown that Caulfield has wrongfully taken any property which Barristers owned. In fact, there is no allegation or proof with respect to Caulfield's tenancy at 175 Court Street.

■ Embezzlement within the meaning of Section 523(a)(4) is also determined under federal common law, which defines it as the "fraudulent appropriation of money by a person to whom such property had been entrusted or into whose hands it has lawfully come." *In re Contella,* 166 B.R. 26, 30 (Bankr.W.D.N.Y.1994) (*quoting Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)); *In re Kressner,* 155 B.R. 68, 74 (Bankr.S.D.N.Y.1993); *In re Balzano,* 127 B.R. 524, 532 (Bankr. E.D.N.Y.1991); *In re Jardula,* 122 B.R. 649 (Bankr.E.D.N.Y.1990). The objectant must show that the debtor misappropriated funds for his own purpose and that he did so with a fraudulent intent or deceit. *Contella,* at 30. It differs from larceny in that the original taking of the property is lawful. *In re Balzano,* 127 B.R. 524, 533 (Bankr.E.D.N.Y. 1991). Embezzlement involves the "appro-

priation of property belonging to another person or entity." *In re Kibler,* 172 B.R. 740, 742 (Bankr.W.D.N.Y.1994); *In re Contella,* 166 B.R. 26, 30 (Bankr.W.D.N.Y.1994). Where the creditor is neither the owner of nor in possession of the assets, there can be no embezzlement, for "no person can embezzle from himself." *Contella,* at 30 (no embezzlement where Debtor sold a tractor in which creditor had a security interest but failed to remit sale proceeds to creditor). Where title to the property is in the debtor, there can be no embezzlement. *Id; Kibler,* at 742.

Here, there has been no showing of any wrongdoing on the Debtor's part with respect to his tenancy of the premises at 175 Court Street. Nor has Barristers established any connection between Caulfield's transfer of 192 Dean Street to Elliot, on the one hand, and the taking of any property from Barristers, lawfully or unlawfully, on the other. Therefore, the debt is not one "for ... embezzlement, or larceny."

■ Lastly, the Court declines Barristers' invitation to find that the alleged fraudulent conveyance of 192 Dean Street supports a claim under Section 523(a)(4) independently of the elements normally required. The Court is unaware of any theory, and Barristers has pointed to none, by which the alleged fraudulent conveyance of 192 Dean Street more than 8 years prior to the filing and 6 years prior to Barristers' judgment could render the unrelated judgment nondischargeable. Nor can Barristers attempt to avoid the fraudulent conveyance in this Court, as it already has such an action pending in another forum, and in any event, the Trustee and not Barristers is the proper party to assert it here. *In re AP Industries, Inc.,* 117 B.R. 789 (Bankr. S.D.N.Y.1990); *In re Daniele Laundries, Inc.,* 40 B.R. 404 (Bankr.S.D.N.Y.1984). In addition, although Barristers has not clearly articulated such a theory, to the extent that it is seeking a declaration that any debt which may be found to be owed to it as a result of a judgment to be rendered in its fraudulent conveyance action is nondischargeable, Barristers would still have to establish that that debt comes within Section 523(a)(4), which it has not done for the reasons set forth above.

**B. *523(a)(2)(A)***

■ 11 U.S.C. § 523(a)(2)(A) provides:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition.

■ The burden is on the plaintiff to establish each of the elements of the statute by a preponderance of the evidence. *In re Balzano,* 127 B.R. 524 (Bankr.E.D.N.Y.1991); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). This standard fairly balances the conflicting interests resulting from the provisions of the Code which discharge a Chapter 7 debtor from his prepetition debts. A discharge is meant to provide an insolvent debtor with a "fresh start"; the exceptions to discharge are designed to limit that ideal to the "honest but unfortunate debtor." *Grogan,* at 286, 111 S.Ct. at 659 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

■ To sustain a claim under § 523(a)(2)(A), a creditor must establish the following:

(1) The debtor made a false representation;

(2) That at the time the representation was made, the debtor knew it was false;

(3) The debtor made the representation with the intention of deceiving the creditor;

(4) The creditor relied on the representation; and

(5) The creditor sustained loss or damage as the proximate consequence of the false, material misrepresentation.

*In re Hanna,* 163 B.R. 918 (Bankr.E.D.N.Y. 1994); *In re Jacone,* 156 B.R. 740 (Bankr. S.D.N.Y.1993) (Schwartzberg, B.J.); *In re Tesmetges,* 86 B.R. 21, 24 (E.D.N.Y.1988); *In*

*re Balzano,* 127 B.R. 524, 530 (Bankr. E.D.N.Y.1991).

Section 523(a)(2) precludes the discharge of debts only "to the extent obtained" through false pretenses, false statements, or actual fraud. It "relates only to the creation of the current credit relationship . . . [and] a plaintiff must establish a causal connection between the misrepresentation and the loss suffered." *In re Kibler,* 172 B.R. 740, 742 (Bankr.W.D.N.Y.1994) (no showing that any misrepresentation caused creditor to suffer losses greater than those which it would have otherwise occurred). In addition, the plaintiff must show justifiable reliance on the misrepresentation. *Field v. Mans,* — U.S. —, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

The only allegation of a false representation other than one respecting Caulfield's financial condition is that Caulfield held himself out as married to Elliot. However, the testimony failed to show that Caulfield made such a representation. First, both Caulfield and Elliot denied that they ever held themselves out as married. Second, even if the Court were to credit Mercaldo's testimony that he referred to Elliot as Caulfield's wife and was not corrected, this hardly amounts to an affirmative misrepresentation made by Caulfield with the intent to deceive. Rather, it appears more likely that Mercaldo inferred that they were married by "asking people in the neighborhood." Misrepresentations made by others cannot, however, be imputed to Caulfield for this liability. Barristers' proof is patently insufficient and its claim therefore fails. In addition, there has been no showing whatsoever that Barristers relied in any manner, no less justifiably, on this alleged representation, or that there is any causal connection between the misrepresentation and the loss suffered. Caulfield's debt to Barristers is therefore dischargeable pursuant to Section 523(a)(2)(A).

## C. *523(a)(2)(B)*

11 U.S.C. § 523(a)(2)(B) provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

Again, the burden is on the plaintiff to establish each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Balzano,* 127 B.R. 524 (Bankr. E.D.N.Y.1991).

A deed constitutes a statement in writing respecting the Debtor's financial condition, *i.e.,* a statement respecting the liabilities of the Debtor and the encumbrances against his property. The signature of the Debtor on the deed is sufficient to satisfy the writing requirement. *In re Granovetter,* 29 B.R. 631 (Bankr.E.D.N.Y.1983). False statements and misrepresentations as to the existence of liens or encumbrances on realty constitute actionable fraud, even though liens and encumbrances are matters of public record. *Chery v. Anthony,* 156 A.D.2d 414, 548 N.Y.S.2d 535 (App.Div.1989).[7]

A materially false statement under 11 U.S.C. § 523(a)(2)(B) is one which is substantially inaccurate, *In re Reisman,* 149 B.R. 31, 37 (Bankr.S.D.N.Y.1993), with respect to information which would have affected the creditor's decision-making process. It is a statement which "paints a substantially

**7.** Judge Walter J. Krasniewski of the United States Bankruptcy Court for the Northern District of Ohio concluded that a creditor, which had conducted a title search which failed to reveal a second mortgage granted only two days before the loan closing, had nonetheless relied on the debtor's false statement that there was only one mortgage on the debtor's home. *In re Steinbrunner,* 149 B.R. 484 (Bankr.N.D.Ohio 1992).

untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *In re Furio,* 77 F.3d 622, 625 (2d Cir.1996).

 It is sufficient that the creditor's reliance on the Debtors' representations was a contributing factor in causing the loss even though such reliance was partial and not solely motivated by the Debtors' false representations. *In re Salzman,* 61 B.R. 878, 888 (Bankr.S.D.N.Y.1986).

 The requisite degree of intent to deceive may be inferred from the circumstances surrounding the transaction, *In re Gould,* 73 B.R. 225 (Bankr.N.D.N.Y.1987), and direct proof of intent to deceive is not required. *In re Reisman,* 149 B.R. 31 (Bankr.S.D.N.Y.1993).

The Court concludes that Barristers has failed to meet its burden. Even assuming that by holding title to 192 Dean Street in his name alone, Caulfield concealed a secret interest held by Elliot and that the deed to 192 Dean Street constituted a written statement respecting Caulfield's financial condition, there is absolutely no evidence that Barristers relied on that statement in any manner, that the statement was material to Barristers in connection with 175 Court Street, or that it caused any loss to Barristers. Barristers' only proof is that Mercaldo, after speaking to Caulfield in April, 1984 about the 175 Court Street premises, conducted a title search of Caulfield's residence. He presumably did so out of curiosity, since Barristers' judgment was not obtained until 1991.

Equally clear is that Caulfield's debt arises from his tenancy of his business premises at 175 Court Street, not his residence at 192 Dean Street. Moreover, the dispute concerning 175 Court Street began prior to Barristers' ownership of the building, since one of the conditions of Barristers' purchase was that it be made a party to pending litigation. Under the circumstances, it is difficult to imagine that the debt to Barristers was caused, or "obtained by," a false statement respecting Caulfield's residence.

**D. *727(a)(5)***

 11 U.S.C. § 727(a)(5) provides:

(a) The court shall grant the debtor a discharge, unless—

* * * * * *

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . . .

 Section 727 is strictly construed against the objectant and liberally in favor of the Debtor. *In re Adlman,* 541 F.2d 999, 1003 (2d Cir.1976); *In re Shapiro,* 59 B.R. 844, 847 (Bankr.E.D.N.Y.1986). As Bankruptcy Chief Judge Conrad R. Duberstein observed,

This is in order to protect the debtor's fresh start. However, the policy in favor of providing the honest debtor with a fresh start must be weighed against the countervailing policy of ensuring that dependable information is available to those interested in the administration of the bankruptcy estate. See *In re Diodati,* 9 B.R. 804, 807–08 (Bankr.D.Mass.1981); *In re Shapiro,* 59 B.R. at 849. "In order to obtain a discharge, a debtor must reveal and not conceal his or her financial condition because complete disclosure is the touchstone in a bankruptcy case." *In re Bernard,* 99 B.R. 563, 570 (Bankr.S.D.N.Y.1989).

*In re Sapru,* 127 B.R. 306, 314 (Bankr. E.D.N.Y.1991).

 Section 727(a)(5) requires a creditor to prove that the debtor no longer has assets which the debtor previously owned and that the debtor has failed to explain the loss. *In re Colodner,* 147 B.R. 90, 94 (Bankr.S.D.N.Y. 1992); *In re Gannon,* 173 B.R. 313 (Bankr. S.D.N.Y.1994). Plaintiff has the burden of introducing evidence of the disappearance of assets. The burden then shifts to the debtor to explain the loss or deficiency assets. *In re Wolfson,* 139 B.R. 279, 286 (Bankr.S.D.N.Y. 1992), *aff'd.,* 152 B.R. 830 (S.D.N.Y.1993); *In re Silverstein,* 151 B.R. 657, 663 (Bankr. E.D.N.Y.1993).

 To be satisfactory, the explanation must convince the court that the debtor "has

not hidden or improperly shielded assets," *In re Bodenstein*, 168 B.R. 23, 33 (Bankr. E.D.N.Y.1994), and "must convince the court of the debtor's business like conduct and good faith ... [and] must appear reasonable such that the court 'no longer wonders' what happened to the assets." *Wolfson, supra*, at 289 (*quoting In re Trogdon*, 111 B.R. 655, 659 (Bankr.N.D.Ohio 1990)); *see In re Gannon*, 173 B.R. 313 (Bankr.S.D.N.Y.1994). The Code does not require that the Debtor's explanation be meritorious, or "that the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily account for the disposition." *Bodenstein*, at 33; *In re Silverstein*, 151 B.R. 657, 663 (Bankr.E.D.N.Y.1993) (the question is "whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper").

Although some courts require that the Debtor's explanation be corroborated by documentary proof, *see In re Wolfson*, 139 B.R. 279, 286 (Bankr.S.D.N.Y.1992), *aff'd.*, 152 B.R. 830 (S.D.N.Y.1993) ("Vague and indefinite explanations of losses that are based upon estimates, uncorroborated by documentation are unsatisfactory"), others do not, where the Debtor's testimonial explanation is credible. *Bodenstein, supra*, at 34.

The only asset allegedly lost to creditors in this proceeding is the 192 Dean Street Property and the proceeds of its sale in 1985, 8 years prior to the bankruptcy filing. The uncontroverted testimony establishes that Caulfield received approximately $90,000 at the May 3, 1985 closing. It was also uncontroverted that Caulfield invested the proceeds into Meridian by, as he stated, putting

> [s]ome of the money went toward shoring up cash flow; some of the money went toward litigation fees in connection with my specific performance action to recover the building.... [T]he bulk of the money ... was used to open a large office up on

Montague Street in Brooklyn and to totally renovate that space.... [A]nother portion of the money was used to open an office on Flatbush Avenue in Brooklyn.

The Court believes that Caulfield's explanation was satisfactory in the circumstances here. Caulfield's testimony in this regard is credible. Moreover, the Court finds that his expenditure of these monies over the course of eight years is an insufficient basis upon which to deny his discharge, particularly where the creditor has not come forward with any evidence to challenge the adequacy of Caulfield's explanation. *In re Zell*, 108 B.R. 615 (Bankr.S.D.Ohio 1989). Simply put, there is no showing by Barristers of any connection between Caulfield's divestiture of his interest in 192 Dean Street and a deficiency of assets sufficient to meet his liability on Barristers' judgment six years later, much less his filing of bankruptcy eight years later.

**E. Section 727(a)(3)**

Plaintiff also alleges, without specifics, that Caulfield has concealed, destroyed, mutilated or failed to keep or preserve sufficient recorded information from which his financial condition or business transactions might be ascertained. It seeks judgment barring the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3).[8]

The policy underlying Section 727(a)(3) is to insure that the trustee and the creditors receive sufficient information to effectively enable them "to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *In re Frommann*, 153 B.R. 113, 116 (Bankr.E.D.N.Y. 1993) (*quoting In re Goldstein*, 123 B.R. 514, 522 (Bankr.E.D.Pa.1991)). Further, the disclosure required by Section 727(a)(3) extends beyond property of the estate to include "all business transactions which shed light on the financial condition of the debtor." *Office of*

---

**8.** Section 727(a)(3) provides:
(a) The court shall grant the debtor a discharge, unless—
 * * * * * *
(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve

any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

*the Comptroller General v. Tractman,* 107 B.R. 24, 27 (S.D.N.Y.1989).

Whether or not the records produced by the debtor are sufficient is within the court's discretion. *Frommann,* at 117. "It is a question in each instance of reasonableness in the particular circumstance." *In re Underhill,* 82 F.2d 258, 259 (2d Cir.), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936). The inquiry focuses on whether the debtor's present financial condition and the debtor's recent business transactions for a reasonable period in the past can be ascertained with substantial completeness and accuracy. *In re Pulos,* 168 B.R. 682, 690 (Bankr.D.Minn.1994). There should be some nexus between the Debtor's failure to keep records, destruction or loss of records and the creditor's ability to ascertain the debtor's financial condition. *In re Frank,* 1991 WL 43033 (Bankr.E.D.Pa. Mar. 28, 1991). In determining the adequacy of the records, the court considers several factors:

(1) whether a debtor was engaged in business and, if so, the complexity and volume of the business;

(2) the amount of the debtor's obligations;

(3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;

(4) the debtor's education, business experience and sophistication;

(5) the customary business practices for record keeping in the debtor's type of business;

(6) the degree of accuracy disclosed by the debtor's existing books and records;

(7) the extent of any egregious conduct on the debtor's part; and

(8) the debtor's courtroom demeanor.

*Frommann,* at 117 (*quoting In re Minesal,* 81 B.R. 477, 481 (Bankr.E.D.Wisc.1988)).

The plaintiff need not prove intent to conceal one's financial condition. *In re Underhill,* 82 F.2d 258 (2d Cir.1936), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936); *In re Artura,* 165 B.R. 12 (Bankr. E.D.N.Y.1994).

Once the plaintiff proves, by a preponderance of the evidence, that the records are insufficient to enable others to determine the financial affairs and business transactions of a debtor, the burden shifts to the debtor to justify any deficiencies. *Frommann,* at 117; *In re Gannon,* 173 B.R. 313 (Bankr.S.D.N.Y. 1994); *In re Wolfson,* 152 B.R. 830 (S.D.N.Y. 1993).

"In considering the Debtor's explanation of the missing records, the court should consider the 'Debtor's education, the sophistication of the Debtor's business, the Debtor's personal financial structure, and any special circumstance that may exist.'" *In re Wolfson,* 139 B.R. 279, 287 (Bankr. S.D.N.Y.1992), *aff'd,* 152 B.R. 830 (S.D.N.Y. 1993) (*quoting In re Harmon,* 1992 WL 13624, at *5 (Bankr.W.D.Tenn. Jan. 10, 1992)). A sophisticated debtor is generally held to a higher level of accountability in recordkeeping, and the more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records should be. *In re Pulos,* 168 B.R. 682, 690 (Bankr.D.Minn.1994). Further, the test is an objective one, and the debtor "cannot assert an honest belief that he or she did not need to keep the records. Instead, debtors have a duty to preserve those records that others in like circumstances would ordinarily keep." *Id.* at 692; *see In re Pimpinella,* 133 B.R. 694 (Bankr.E.D.N.Y.1991).

Barristers' complaint does not specify what books and records Caulfield has destroyed or failed to keep or preserve. In its pre-trial memorandum, Barristers argues that

the Debtor has admitted in the deposition held on October 22, 1993, that he has thrown away financial documents which would enable creditors and the trustee to trace what happened to the alleged proceeds of the sale of 192 Dean Street … as well as the Debtor's other affairs with respect to his business. *See* Caulfield transcript Pgs. 32–36 annexed to Local Rule 22 Statement. As such, the plaintiff has not only set forth a cause of action pursuant to 723(a)(3) [sic], but the debtor has admitted that he destroyed records in violation of § 723(a)(3) [sic].

The Court will not consider the transcript of the examination of Caulfield as evidence of

his destruction of or failure to keep records, because Barristers never moved its admission into evidence at trial and the copy annexed to its Local Rule 22(b) statement is unsigned and unnotarized. It is therefore not properly part of the trial record.

Barristers did not prove at trial that it requested documents of Caulfield which he did not produce. Although the Court will take judicial notice of the file in the bankruptcy case and notes that the 2004 Order directed Caulfield to produce certain documents, Barristers introduced no evidence that the 2004 Order was ever served on Caulfield. Nor did anyone testify on Barristers' behalf that the documents were requested but not, in fact, produced.

Further, Barristers has not established any connection between Caulfield's alleged failure to produce records and its ability to ascertain the Debtor's "present financial condition and the Debtor's recent business transactions for a reasonable period in the past ... with substantial completeness and accuracy." *In re Pulos,* 168 B.R. 682, 690 (Bankr.D.Minn.1994). Although Caulfield testified on cross-examination that there are no records to trace the proceeds of his sale of 192 Dean Street, the Court notes that the 2004 Order did not call for their production, as Barristers only requested documents respecting transactions within six years prior to the filing.

In addition, there was no testimony by anyone on behalf of Barristers that such records would have assisted it in ascertaining Caulfield's present financial condition or recent business transactions. This is not a case where the Debtor has transferred significant property on the eve of bankruptcy and failed to produce documents relating to the transfers or to account for the proceeds. *See e.g., In re Pulos,* 168 B.R. 682, 690 (Bankr.D.Minn.1994) (failure to produce documents of transfers of real property sufficient to deny discharge).

Similarly, there was no testimony by anyone at Barristers showing that it requested records respecting Meridian, that Caulfield failed to produce them, or that such records would have assisted it in assessing Caulfield's financial condition and business transactions. *In re Frank,* 1991 WL 43033 (Bankr.E.D.Pa. Mar. 28, 1991) (failure to keep records of a corporation which ceased operations three years before bankruptcy an insufficient basis to deny discharge, where creditor did not show any nexus between the failure to keep records and its ability to assess the debtor's financial condition); *In re Gugliada,* 20 B.R. 524, 528 (Bankr.S.D.N.Y.1982) (failure to retain records of a corporation which dissolved six years before bankruptcy insufficient where Debtor discarded documents due to limited storage space). Here, there was no showing that Meridian engaged in business in the several years prior to the filing or that Caulfield earned any income whatsoever from his activities at Meridian. Rather, Caulfield testified, without controversion, that his only support came from free-lance legal work, and his Statement of Financial Affairs shows that he earned less than $20,-000 per year in the three years prior to the filing from "Consulting & Legal Fees."

Lastly, Barristers has not alleged or proven that others in the Debtor's circumstances would have kept the records, or that it was the customary practice in the real estate brokerage business to retain corporate records for more than three years after the brokerage ceased doing business. Nor has there been any allegation that the records Caulfield did produce are inaccurate in any manner.

As an affirmative defense, Caulfield alleges in his answer that his failure to keep records is justified because Barristers prevented him from entering his business premises in 1991, removed certain property from the premises and placed it in the street. No testimony respecting this defense was adduced at trial.[9] Accordingly, it fails. For the same reason, Caulfield's claim of justification due to severe illness fails.

Lastly, Caulfield testified at trial that he discarded records when he moved to a small

---

9. Caulfield also testified at trial that he did not keep books and records at 175 Court Street. Tr. at 128.

 

apartment with only one closet, and had insufficient storage space to keep them. The Court believes that Caulfield has shown sufficient justification where, as here, the discarded documents relate to transactions which occurred many years before the filing and the creditor has not shown that the lack of documents made it difficult to ascertain the Debtor's financial condition. *In re Gugliada,* 20 B.R. 524, 528 (Bankr.S.D.N.Y.1982) (fact that Debtor discarded records of a corporation which dissolved six years before bankruptcy insufficient to deny discharge where Debtor discarded documents due to limited storage space).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a) and the Standing Order of Reference of the United States District Court for the Eastern District of New York.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), (J). Venue is proper pursuant to 28 U.S.C. § 1408.

3. Barristers failed to prove by a preponderance of the credible evidence that Caulfield made a false representation other than one concerning his financial condition, upon which it relied and which caused it loss or damage. His debt is therefore dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

4. Barristers failed to prove by a preponderance of the credible evidence that it relied, to its detriment, prior to or during the dispute respecting 175 Court Street, from which its debt arises, on a representation concerning Caulfield's ownership of 192 Dean Street. Accordingly, the debt is dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

5. Barristers failed to prove by a preponderance of the credible evidence that the debt owed to it was incurred while Caulfield was acting in a fiduciary capacity, or that the debt owed to it is one for embezzlement or larceny. Accordingly, the debt is dischargeable pursuant to 11 U.S.C. § 523(a)(4).

6. Barristers failed to prove by a preponderance of the credible evidence that Caulfield has failed to keep and preserve books and records from which his financial condition and business transactions can be ascertained. Accordingly, his discharge will not be denied pursuant to 11 U.S.C. § 727(a)(3).

7. Barristers failed to prove by a preponderance of the credible evidence that Caulfield failed to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities. Accordingly, his discharge will not be denied pursuant to 11 U.S.C. § 727(a)(5).

Debtor's counsel is directed to settle an Order and Judgment on notice.