In re Brenda Y. HUYNH, a/k/a
Minh Dang, Debtor.

Habbo G. Fokkena, United States
Trustee, Plaintiff,

v.

Brenda Y. Huynh, a/k/a Minh
Dang, Defendant.

Bankruptcy No. 05–37944.
Adversary No. 06–3315.

United States Bankruptcy Court,
D. Minnesota.

Jan. 3, 2008.

Brenda Y. Huynh, Minh Dang, Savage, MN, Pro se.

Barbara J. May, Arden Hills, MN, for Plaintiff.

John A. Hedback, St. Anthony, MN, Trustee.

## ORDER DENYING GENERAL DISCHARGE

DENNIS D. O'BRIEN, Bankruptcy Judge.

The above entitled matter came before the Court for trial on September 10, 2007 on the United States Trustee's complaint seeking judgment denying the defendant-debtor her discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(7). Appearances were as noted on the record. Based upon the pleadings, files, evidence heard and received at trial, and arguments of counsel, the Court being fully advised in the matter, now makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I

The debtor filed for relief under Chapter 7 shortly after incurring more than $300,000 in unsecured debt through the misuse and abuse of credit card, vendor,

and bank accounts. She claims that the debt was the result of cash advances, and purchases and sales of personal property through the credit facilities to fund a gambling addiction episode that she suffered. The alleged gambling losses were disclosed in the debtor's schedules, but, the personal property sales transfers were not. Not all bank accounts were disclosed in the schedules either. The debtor failed to disclose all the transfers and certain bank accounts in later testimony at the § 341 meeting and in a Rule 2004 examination. And, she has not documented either the gambling losses or the transfers. The plaintiff seeks judgment denying the defendant's discharge under various sections of 11 U.S.C. § 727.

The core of the plaintiff's case is the allegation that the gambling episode did not occur, but that the debtor, alone or with others, engaged in a "credit bust out" of the credit facilities, pocketing the cash and secreting personal property ahead of a bad faith bankruptcy filing. The plaintiff claims that the gambling is irrelevant regarding the nondisclosure issues. The plaintiff's action is based on 11 U.S.C. §§ 727:(a)(2), fraudulent transfer or concealment of property to hinder or delay creditors; (a)(3), concealment, destruction, or failure to keep, financial records; (a)(4) making a false oath in connection with the case; (a)(5), failure to adequately explain loss of assets; and, (a)(7), commission of the above acts within one year before filing of the case.

The Court finds that: the plaintiff did not prove by preponderance that the defendant transferred or concealed property to hinder or delay creditors; it has not been shown that the debtor failed to keep sufficient financial records so as to trigger denial of discharge in this case; the plaintiff did not prove by preponderance that the debtor knowingly made a false oath in connection with the case; and, that 11 U.S.C. § 727(a)(7) does not apply. The Court further finds that the debtor's explanation of loss of assets is substantially inadequate, and her general discharge should be denied.

## II

*Debtor's Personal Profile.*

The debtor, born in Vietnam, came to the United States in 1990. She attended high school in California for three years, and later obtained an associates degree in business from Evergreen Valley College in San Jose, California in 1997. She moved to Minnesota in 1999 to get married, and, after some temporary accounting jobs, she was employed as a business consultant with Wells Fargo Bank for about three years. Her husband died of cancer in 2003, and in September of that year she moved back to California. While in California, she worked at Mervyn's Department Store in the accounting department. She returned to Minnesota on June 1, 2005, and has not been employed since. At filing, her income consisted of social security payments for herself and two children in the amount of $2800.00 per month.

*Prepetition Debt Runup.*

Prior to June 2005 the debtor's bank and credit card accounts carried nominal balances. In May and early June, 2005, she began profligate spending through use of the bank accounts and credit cards. She purchased art works totaling $40,000, furniture in the amount of $10,300, entertainment electronics including a 50 inch flat screen television for $5,000 and karaoke equipment for $15,000. During the same time, the debtor incurred $27,000 in debt to start a granite cutting and countertop business in Minnesota that would never become operable.

Shortly after returning to Minnesota in June 2005, the debtor began misusing her credit cards, abusing vendor credit accounts, and check kiting. The defendant used the credit cards and vendor accounts for large cash advances and to purchase gift cards totaling $68,000, which she claims she sold for cash at steep discounts. She issued checks that she knew were not backed by existing deposits, and perhaps not existing accounts, to vendor and credit card accounts in order that it appear that she was paying the accounts in full and timely, which in turn allowed her to draw the accounts up to 100% over their credit limits. In at least one instance, she kited a check to her own bank account. The defendant also sold a leased granite cutter she had intended to use in a startup business at a discount of approximately 50%.[1] By the time her bankruptcy case was filed on October 6, 2007, the debtor claims to have sold all her art works, electronics and most of her furniture, and to have spent the proceeds gambling.

The defendant claims that during the summer of 2005 she suffered from a pathological gambling syndrome that resulted in the delusion that she needed to continue to gamble in the face of ever increasing losses in order to repay the debts that resulted from the funds used to gamble-an irrational quest for the "jackpot." She testified that she believed that she would ultimately win big and intended to pay her creditors when she hit the "jackpot." The episode was triggered, she claims, from an initial successful gambling night in early June when she won $20,000 at a casino playing black jack. She used the winnings, she claims, as a down-pay-ment on a $40,000 Toyota SUV, and went on a summer-long out of control gambling spree.

The defendant testified that she quit gambling in August of 2005. By then all credit lines had been cut, her income remained a modest social security payment resulting from the death of her husband, and she no longer had access to funds needed to gamble. *The Bankruptcy Filing And Postpetition Disclosures.*

On October 6, 2005, the defendant filed bankruptcy under Chapter 7 of Title 11 U.S.C., the Bankruptcy Code. Her attorney took the case, although very busy with other debtor cases.[2] None of the numerous transfers of personal property claimed to have been made by the debtor at steep discounts for cash to fund the 2005 gambling, except the transfer of the cutting machine, were disclosed in the schedules filed with the petition, although they occurred only a few months before the filing. The debtor did not disclose the transfers at the meeting of creditors either, but testified that she had reviewed her petition and schedules and that they were accurate.

Only sometime after the creditors' meeting did the debtor, through correspondence from her attorney to an attorney for the plaintiff, disclose information of numerous transfers of personal property for less than reasonable value. She has since amended her schedules to disclose some of the transfers, but not all. The letter discloses that the debtor purchased gift cards, artwork, and karaoke equipment, then sold those assets at a 50% discount, and, that she invited "strangers" into her home to buy her furniture, all to fund the gambling. Credit card and other financial

---

1. Four of these creditors have nondischargeability actions pending against the defendant arising out of the use of her accounts, and sale of the granite cutter.

2. The newly enacted Bankruptcy Abuse Prevention And Consumer Protection Act of 2005 was scheduled to become effective on October 20, 2005, and debtors scrambled to get filings in before the effective date.

documents pertaining to the debtor's accounts obtained by the plaintiff reveal that jewelry and other electronic equipment were also purchased. The amended Statement of Financial Affairs, filed by the debtor on December 15, 2005, discloses only that she "[b]ought gift cards and sold them to fund gambling, and she bought art work and a karaoke machine to fund gambling, all in June and July, 2005." [3] The defendant has not documented either the transfers or the gambling losses, although the information was requested by the plaintiff.

Disclosure of bank accounts in the debtor's schedules was not complete either. Her schedules and testimony at the Section 341 creditors' meeting disclosed that she had one checking account at TCF bank, one account at MidCountry bank, one account at Prior Lake State Bank, an inactive U.S. Bank account, and a joint account with another person at TCF Bank. Actually, she had other accounts that the plaintiff discovered, which had not been scheduled or disclosed at either the § 341 meeting or at a later Rule 2004 examination. The debtor appeared at the Rule 2004 examination without counsel, explaining that her attorney refused to appear with her unless she paid the attorney $1,500 in advance, which she said she did not have.

### III

11 U.S.C. § 727(a)(2).

■ Under Section 727(a)(2), the Court may deny a debtor's discharge, if:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title has trans-

ferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

The plaintiff's theory here is that the defendant did not suffer gambling addiction, but incurred more than $300,000 in debt in little more than three months with nothing to show for it because she concealed or transferred property purchased during the period to hinder, delay or defraud her creditors in the execution of a "credit bust out" scheme. The term "credit bust out," as used by the plaintiff, means the intentional exhaustion of credit resources by a debtor, who maximizes use of the available credit with no intention of paying down the debt, but with the intention of discharging the debt in bankruptcy. The products and proceeds of the credit used are secreted or disposed of by the debtor, who then falsely claims to have sold the products and spent the proceeds gambling.

That may be true here. But, it remains after the trial, as it was before the trial, a theory without supporting evidence. In order to find in favor of the plaintiff on the allegation, the Court would need to find that she is hiding assets and/or cash, or that she was involved in a conspiracy with unidentified individuals, who paid her off for her participation in a scheme. The plaintiff alludes to such a possible pay off as the source of the $20,000 down-payment on her Toyota and a pay-off of a second mortgage on her home. But, the plaintiff has offered no evidence that would tend to

---

**3.** The art works and karaoke equipment were purchased in May 2005 before the alleged triggering of the gambling episode.

support either scenario, and they both remain pure conjecture. The burden of proof lies with the plaintiff and it has not been met on the 11 U.S.C. § 727(a)(2) claim.

## 11 U.S.C. § 727(a)(3).

Under § 727(a)(3), the Court may deny the discharge of a debtor, if:

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

■ Debtors are required to keep adequate financial records to enable parties and the Court to trace the debtor's financial history, reconstruct financial transactions, and test the completeness of the disclosure requirements. *In re Pulos*, 168 B.R. 682, 690 (Bankr.D.Minn.1994). Ordinarily, failure to do so will result in a denial of discharge.

■ Here, except for lack of recorded transactions of the disposition of her personal property purchased in May and lack of documentation of gambling winnings and losses, there exists substantial documentation of the debtor's financial transactions allowing for their reconstruction. The numerous bank accounts and credit card statements detail the transactions. The issue is what conclusions can be fairly drawn from them in light of other evidence in the case. Those two areas where documentation is lacking leave the debtor without an adequate explanation for the loss of her assets as discussed below, but are insufficient to deny her a general discharge under 11 U.S.C. § 727(a)(3).

## 11 U.S.C. § 727(a)(4).

■ Under Section 727(a)(4), the Court may deny the discharge of a debtor, if:

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

This section, when violated by a debtor, will always result in denial of the general discharge. Here, it is irrelevant whether the defendant had a gambling addiction episode in 2005. The issue is whether she made a false oath or account in her petition and schedules through omission, and whether she lied under oath at the § 341 meeting and later at the Rule 2004 examination. There is no question that the defendant's schedules omitted assets and transfers. And there is no question that omissions continued through testimony at the § 341 meeting and the Rule 2004 examination. The question is whether the omissions were knowingly and fraudulently made.

The debtor's initial attorney in the case gave an affidavit attached to a response to a motion for summary judgment, where she testifies, in part:

4. At the time Debtor became my client, I was extremely busy with the enormous number of Debtors who were trying to get their cases filed before BAPCPA went into effect. Although I had new client intake interviews scheduled about every half hour, I spent nearly 2 hours with Debtor in her first meeting with me.

6. From the beginning, I had a hard time communicating with Debtor.

7. Her English sounds good. Her accent is minimal.

8. However, I noticed that Debtor did not follow instructions well and often asked questions that indicated that

she had not understood what we discussed. Even when I remember that I specifically asking her if she understood, it was clear to me from Debtor's actions and statements at a later time that she had no idea what I was talking about.

9. Debtor's apparent lack of understanding of the questions that I asked her as well as questions put to her at her § 341 hearing lead to her Chapter 7 Trustee filing an objection to her homestead exemption which I successfully defended.

*Affidavit of Ms. Barbara May,* March 5, 2007.

Aside from the matters addressed in the affidavit, it is clear to the Court that the defendant did not have effective legal representation during the time when the omissions were made. For example, counsel was aware that the debtor claimed recent gambling losses of more than $300,000 when her sole income disclosed to counsel was social security payments for her and the debtor's two children in the monthly amount of $2,800, and that she disclosed minimal assets. At the trial, the Court asked Ms. May, who testified on behalf of the defendant, whether those disclosures should have caused her to inquire where the money came from to fund the gambling. She replied no, that in her experience it was not uncommon for a debtor without significant income, assets or access to credit, to suffer gambling losses in large amounts like that claimed here, and that such an inquiry was not called for under these circumstances. The Court finds the response to be lacking.

That is not the only aspect of legal representation of the debtor that was problematic. At the Rule 2004 examination, the debtor testified that she was present without counsel because she could not afford the $1500 demanded by her attorney in advance as a condition for counsel to appear. A Rule 2004 examination is a proceeding in a main Chapter 7 bankruptcy case, and active representation by debtor's counsel is required by Local Rule 9010–3(e):

(e) Substitution; Withdrawal.

4) Effect of Failure to Comply. Until a substitution of attorneys is filed or an order is entered allowing the original attorney to withdraw, the original attorney is the client's attorney of record and the original attorney shall represent the attorney's client in bringing and defending all matters or proceedings in the bankruptcy case other than adversary proceedings in which the original attorney has not yet made an appearance. Failure to receive advance payment or guarantee of attorney's fees is not grounds for failure to comply with this subsection.

Ms. May testified at the trial that she had been obligated to attend the 2004 examination and represent the debtor, and offered no excuse for not doing so. When asked if she told the debtor that her appearance was conditioned on the payment in advance of $1500, she responded that the debtor might have understood it that way. In an order issued September 19, 2007, the Court found that Ms. May had failed to represent the debtor as required by the Local Rule, enjoined her future violations of the Rule, and required her to forfeit all fees received in the case.

The omissions made by the defendant in her schedules and later testimony would be sufficiently serious to deny her a general discharge if she had effective legal counsel at the time the omissions were made. The Court cannot make that finding in this case. Therefore, the discharge will not be denied under 11 U.S.C. § 727(a)(4).

**11 U.S.C. § 727(a)(7)**

Under this section, the Court may deny the discharge where:

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;

The section only applies where a debtor commits the specified acts in connection with another case under Title 11 concerning an insider. Clearly, the section has no application here.

**11 U.S.C. § 727(a)(5)**

■ Under Section 727(a)(5), the Court may deny the discharge of the debtor, if:

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

The defendant explains that she used her credit card and bank accounts for cash advances and to purchase personal property that was sold for cash at steep discounts to fund a gambling addiction over a period of essentially two months, resulting in debt to these creditors of more than $300,000. When the credit ran out, by the end of the first month, she kited checks to cover a number of accounts and double dip the credit before the kites were discovered. After that, she claims, the debtor sold the personal property she had purchased in May and early June to continue to fuel out of control gambling. When those proceeds were exhausted, she claims, she was finally forced to quit gambling.

In support of her gambling claims, the defendant offers the testimony and report of an expert witness.

In my opinion, Ms. Huynh, based on her reporting and my assessment, presents as a pathological gambler. She meets criteria by her reporting that she has had a preoccupation with gambling. Spent increased amounts of money to achieve excitement, has had unsuccessful efforts to control her gambling, and has been irritable when she has tried to stop.

The delusion of the compulsive gambler is that they're so far in debt from their gambling that they need to continue in order to pay back all the money they've used to gamble. Of course, the money would be paid back with the next big jackpot that seems inevitable to them because they spend so much time gambling. They have an inability to see each bet as separate. They begin to compromise their values and lie to conceal the extent of their gambling. Sometimes illegal acts are committed such as forgery, kiting checks. Fraud or embezzlement from their jobs -all to finance their gambling. Seeing themselves as hopeless. They can't explain, even to themselves, why they persist and suicide becomes an option. Compulsive gamblers have a high rate of suicide attempts. I have worked with Ms. Huynh since October 5, 2006. I believe that her intent was not to defraud creditors but to "borrow," with the intent of paying all the money back with her next big win.

Susan Johnson. M.A., l.A.M.F.T. Gambling Treatment Specialist.

*Affidavit of Susan Johnson* attached to the defendant's response to the plaintiff's motion for summary judgment, filed February 2, 2007. Ms. Johnson so testified at the trial. The opinion is not enough to present an adequate explanation of the defendant debtor's loss of assets for several reasons.

The defendant began seeing Ms. Johnson in October 2006, one year after she claims to have quit gambling, and only after this litigation was commenced against her for denial of her discharge. More importantly, Ms. Johnson relied solely on information presented to her by the defendant, without corroboration of any kind. And, the information was not entirely accurate. For example, Ms. Johnson understood that the defendant began addictive gambling shortly after her husband died. Actually, her husband had died two years before the 2005 the claimed gambling episode. The report and testimony is inadequate because there exists nothing to support it other than what the expert was told by the defendant.

And, the defendant has not presented any significant corroborating evidence to her claims in this proceeding either. We know that the defendant gambled in the summer of 2005. Credit card statements reveal a number of modest ATM cash withdrawals in or near casinos, and two witnesses testified that they saw her occasionally at one or another casino. But, these facts fall far short of an explanation of losses of more than $300,000 to addictive gambling. In the end, we are essentially asked to take the defendant's word and nothing more as an adequate explanation. That is not sufficient.

The purchase of luxury items in excess of $70,000 for alleged personal use and enjoyment at a time when the defendant's sole source of income to support herself and two children was social security of $2,800 a month, is totally without any rea-sonable explanation.[4] These purchases were allegedly made without the thought of gambling. The claim that she later sold the property to strangers at steep discounts without documentation to fuel a gambling addiction is not an adequate explanation either because there is no independent corroborating evidence of gambling addiction offered by the defendant.

Corroborating information should have been available to the defendant in documents of the purchase of the defendant's Toyota. It is her alleged winnings of $20,000 at a casino in early June that the debtor claims triggered her addictive gambling. She testified that she used the winnings as the down-payment on the purchase of the vehicle. That should have been verifiable through documents of the transaction. If she paid the dealer by check, there would be a supporting deposit or deposits of $20,000 from which the cash winnings might be traced. If the dealer accepted a payment in currency, not likely, the dealer would have been required to report the transaction to the Financial Crimes Enforcement Network. 31 U.S.C. § 5331. *Reports relating to coins and currency received in nonfinancial trade or business.* A copy of the report should have been available. It is especially important for corroborating evidence of the source of funds used to purchase the vehicle because the defendant failed to declare any gambling winnings on her 2005 income tax return.[5]

No corroborating evidence of gambling losses has been offered by the defendant

---

4. *In a letter to the plaintiff's attorney, the* defendant disclosed that she purchased and sold karaoke equipment and art work to fund gambling. But, she testified at the trial that she purchased these items and the 50 inch flat panel television in May 2005 for her own entertainment and personal use.

5. The plaintiff argues that the casino would have been required issue a W2–G form reporting the winnings to the IRS if she won $20,000 at a casino. But, that reporting is only required where such winnings are from a single wager, exceed $1,000, and are more than 300 times the amount of the single wager. 26 C.F.R. 31.3402(q)–1(b)(3).

either. Many forms of evidence are acceptable to the IRS.

### SEC. 3. PROCEDURES.

An accurate diary or similar record regularly maintained by the taxpayer, supplemented by verifiable documentation will usually be acceptable evidence for substantiation of wagering winnings and losses. In general, the diary should contain at least the following information:

1) Date and type of specific wager or wagering activity;

2) Name of gambling establishment;

3) Address or location of gambling establishment;

4) Name(s) of other person(s) (if any) present with taxpayer at gambling establishment; and

5) Amount(s) won or lost.

Verifiable documentation for gambling transactions includes but is not limited to Forms, W—2G; Forms 5754, Statement by Person Receiving Gambling Winnings; wagering tickets, canceled checks, credit records, bank withdrawals, and statements of actual winnings or payment slips provided to the taxpayer by the gambling establishment.

Where possible, the diary and available documentation generated with the placement and settlement of a wager should be further supported by other documentation of the taxpayer's wagering activity or visit to a gambling establishment. Such documentation includes, but is not limited to, hotel bills, airline tickets, gasoline credit cards, canceled checks, credit records, bank deposits, and bank withdrawals.

Additional supporting evidence could also include affidavits or testimony from responsible gambling officials regarding wagering activity.

With regard to specific wagering transactions, winnings and losses may be further supported by the following items: .03 Table Games: Twenty One (Blackjack), Craps, Poker, Baccarat, Roulette, Whell [sic] of Fortune, Etc.- The number of the table at which the taxpayer was playing. Casino credit card data indicating whether the credit was issued in the pit or at the cashier's cage.

Rev. Proc. 77–29, 1977 WL (IRS RPR), 1977–2 C.B. 538. Given the intense and short time that the defendant claims to have gambled away more than $300,000 in losses in the summer of 2005, she should have been able to offer some form of corroboration for the losses.

It is quite possible that the defendant suffered a compulsive gambling addiction episode in the summer of 2005, and that caused her to lose valuable assets and misuse bank accounts and credit cards. But, the defendant has the burden of proof by preponderance to explain the loss of her assets. Without any corroborating evidence, her explanation is nothing more than a naked assertion, and has no more weight than the plaintiff's "credit bust out" theory.

### IV

Based on the forgoing, the Court concludes that the defendant debtor's discharge must be denied under 11 U.S.C. § 727(a)(5) for failure satisfactorily explain the loss of her assets and the deficiency of her assets to meet her liabilities.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**